**AMERICAN FEDERATION OF
MUSICIANS et al.**

v.

**STEIN.**

No. 12051.

United States Court of Appeals
Sixth Circuit.
June 16, 1954.

Emanuel L. Gordon, New York City, Jordan Stokes, III, Nashville, Tenn., of counsel, for appellants.

Harry Lester, Nashville, Tenn., for appellee.

Before ALLEN and McALLISTER, Circuit Judges, and STARR, District Judge.

McALLISTER, Circuit Judge.

This is an appeal from an order granting a preliminary injunction issued to prevent impending irreparable injury. Appellants contend that the district court. was without jurisdiction to issue the preliminary injunction inasmuch as there was no diversity of citizenship; that the issuance of the temporary injunction was in violation of the Norris-LaGuardia Act, 29 U.S.C.A. § 101 et seq., since the relief was granted in a controversy that involved a labor dispute; and that the district court had no power to enjoin a labor union from placing the name of appellee, as an employer, on its unfair list, to publicize the existence of a labor dispute in violation of the First Amendment to the Constitution.

Appellee is a citizen of Tennessee and is engaged in the business of booking entertainment for public shows and exhibitions. In 1951, he entered into a contract with a band leader to play two performances in Memphis, Tennessee. The band failed to appear as scheduled, and thereafter, appellee was advised by the American Federation of Musicians, of which the band leader was a member, to

submit his claim to the arbitration board of that union. Appellee did so, but claims that the matter was so long delayed without any action being taken, that when the same band leader came again to Tennessee, appellee sued him and, as a result, the band leader settled appellee's claim of damages by a money payment. Thereafter, the American Federation of Musicians placed appellee's name on its unfair list, and circulated this list in its official journal throughout the United States and Canada, in many issues of the magazine. It appears that for a time thereafter, appellee was not following his booking business, but that when he had an opportunity to reenter it, he found he was boycotted by musicians, as a result of the "unfair" listing. He, therefore, filed a complaint on July 30, 1953, in the District Court for the Middle District of Tennessee, claiming damages and asking for the issuance of an injunction to prevent the American Federation of Musicians from circulating his name in its unfair list. Among the allegations in his complaint, appellee set forth that his name was placed on the unfair list merely because he had sued the band leader and thus enforced his claim for damages; that the placing of appellee's name on the unfair list constituted an automatic boycott of appellee by each and every member of the union; that, as a result, appellee had been totally and illegally prevented from pursuing his profession and denied the right to earn his livelihood in his accustomed and rightful manner; and that the listing of his name on the unfair list was libelous per se, and done with intent to injure and defame appellee and damage him in his business.

The parties named defendant in this suit, after amendments not here relevant, were the American Federation of Musicians, a voluntary organization with its principal offices in New York City; James C. Petrillo, as its President; and George Cooper, as the representative of the American Federation of Musicians, Local Union No. 257, with offices in Nashville, Tennessee. No question of service is raised on this appeal. A motion for injunction was filed by appellee, which was noticed for hearing for August 5, 1953, at Nashville, Tennessee; and on that day, the motion came on for hearing before the Honorable Elmer D. Davies, and was adjourned to August 7. Counsel appeared generally for defendant George Cooper, and for Local No. 257 of Nashville, and entered a special appearance for the American Federation of Musicians, a voluntary, unincorporated association, for the purpose of resisting the issuance of a temporary injunction, on jurisdictional grounds.

On the hearing, an affidavit of Mr. Petrillo, one of the defendants, was filed, setting forth that he had just returned from Europe on August 4, 1953; that he had been advised that a carbon copy of the notice of motion had been received in his office on August 3; that neither he nor anyone in his office had at that time received a copy of the complaint; that neither George Cooper nor Local 257 had ever been designated or authorized to act as an agent or representative of the American Federation of Musicians for any purpose whatever; and that the American Federation of Musicians was a labor organization, an unincorporated association, with executive offices in New York City and Newark, New Jersey, and that it did not do business in the State of Tennessee. An affidavit of Mr. Cooper was also filed; and Mr. Stein, the plaintiff, and Mr. Cooper, one of the defendants, were sworn as witnesses.

The evidence thus introduced pertained to the relationship as between the local union and the American Federation of Musicians, as well as to the relationship between defendant Cooper, the president of the local and the Federation. It also disclosed the nature of the contractual relationship between third persons who contract with members of the American Federation of Musicians; the obligations of such members to the Federation, and the rights of the local unions in such contracts. It also appears from the evidence that the contract entered into between appellee and traveling musical organizations was governed by bylaws,

regulations, and resolutions of the American Federation of Musicians; that delegates of the local union participated in forming the rules and regulations under which the American Federation of Musicians operates; that the local union has a jurisdiction for which it is responsible in the State of Tennessee and in part of the State of Kentucky; and that it collects and forwards dues to the American Federation of Musicians.

After the presentation of the foregoing evidence, the district court entered an order setting forth that it appeared that unless a temporary injunction issued, the plaintiff would suffer irreparable damages, "inasmuch as his name will be carried on the 'unfair list' published monthly in defendants' official magazine, and which will prevent him from making contracts with musicians for the fall season, which will begin shortly." In deciding to issue the temporary injunction, the district court stated to counsel in open court: "Let the injunction be granted and this will require going into several issues of fact relative to the jurisdiction. The defendant in this case will have the right to rely upon the same defenses raised at this time upon the hearing of the cause." It does not appear that the allegations of the complaint were traversed or that any answers were filed or that any written objections were interposed to the motion for injunctive relief, either by the defendants appearing specially or generally. As far as the record discloses, no arguments were advanced and no legal authorities cited by the defendants. There appear to have been no briefs filed before the district court on matters of fact or of law. The preliminary injunction, in view of the remarks of the district court, could be said to partake of the nature of a temporary stay such as is subject to being vacated on motion at any time upon a showing of fact or law that its continuance is not justified. In fact, it appears that defendants-appellants did file a motion to dissolve the preliminary injunction on August 26, 1953, and noticed it for hearing on September 1, 1953. However, before the district court heard the motion to vacate, appellants filed their notice of appeal to this court.

We are of the opinion that the granting of the preliminary injunction should be sustained. In Blount v. Societe Anonyme du Filtre Chamberland Systeme Pasteur, 6 Cir., 53 F. 98, 101, a case heard before Judge Jackson (later Justice Jackson, of the Supreme Court) and Judge Taft (later Chief Justice Taft, of the Supreme Court), the court said: "The object and purpose of a preliminary injunction is to preserve the existing state of things until the rights of the parties can be fairly and fully investigated and determined upon strictly legal proofs, and according to the course and principles of courts of equity. * * * The legal discretion of the judge or court in acting upon applications for provisional injunctions is largely controlled by the consideration that the injury to the moving party, arising from a refusal of the writ, is certain and great, while the damage to the party complained of, by the issuance of the injunction, is slight or inconsiderable."

In passing upon the issue then before the court, Judge Jackson referred to what was said by Lord Cottenham in Great Western R. Co. v. Birmingham & O. J. Ry. Co., 2 Phil.Ch. 602:

"It is certain that the court will in many cases interfere and preserve property in statu quo during the pendency of a suit in which the rights to it are to be decided, and that without expressing, and often without having the means of forming, any opinion as to such rights. It is true that the court will not so interfere if it thinks that there is no real question between the parties; but, seeing that there is a substantial question to be decided, it will preserve the property until such question can be regularly disposed of. In order to support an injunction for such purpose, it is not neces-

sary for the court to decide upon the merits in favor of the plaintiff";

and in Glascott v. Lang, 3 Mylne & C. 455, it was stated by the same judge that—

"In looking through the pleadings and evidence for the purpose of an injunction, it is not necessary that the court should find a case which would entitle the plaintiffs to relief at all events. It is quite sufficient if the court finds, upon the pleadings and upon the evidence, a case which makes the transaction a proper subject of investigation in a court of equity."

In his opinion in the Blount case, supra, Judge Jackson also referred to the rule in reference to preliminary injunctions stated in Shrewsbury v. Railway Co., 1 Sim.(N.S.) 410–426: "That there are two points on which the court must satisfy itself. First, it must satisfy itself, not that the plaintiff has certainly a right, but that he has a fair question to raise as to the existence of such a right. The other is whether 'interim' interference, on a balance of convenience or inconvenience to the one party and to the other, is or is not expedient." In United States v. Brotherhood of Locomotive Firemen and Enginemen, D.C.N.D.Ohio, 104 F.Supp. 741, 743, Judge Freed, in passing upon an application for a preliminary injunction by the United States against unions to prevent participation in a strike, where it was claimed that, without such injunctive relief, there would result irreparable damage to the security of the United States, held that the court "is empowered to issue the necessary order, reserving its decision of jurisdiction to a time when, after a full hearing, adequate study and reflection will be afforded to properly interpret and apply the law." "The granting or denial of a temporary injunction pending final hearing is within the sound judicial discretion of the trial court, and upon appeal an order granting such an injunction will not be disturbed unless contrary to some rule of equity or the result of an improvident exercise of judicial discretion. Especially will the granting of a temporary writ be upheld when the balance of injury as between the parties favors its issue. * * * If the questions presented by a suit for an injunction are grave and difficult and the injury to the moving party will be certain, substantial, and irreparable if the motion for a temporary injunction is denied and the final decision is favorable, while if the motion is granted and the decision is unfavorable the inconvenience and loss to the opposing party will be inconsiderable * * *, the injunction usually should be granted." Pratt v. Stout, 8 Cir., 85 F.2d 172, 176. When the nature of the questions which arise upon a suit make them a proper subject for deliberate examination, and if a stay of proceedings will not result in too great injury to the defendants, it is proper to preserve the existing state of things until the rights of the parties can be fairly and fully investigated and determined. Hadden v. Dooley, 2 Cir., 74 F. 429. Ordinarily, an appellate court, upon an appeal from an order granting or denying a temporary injunction, will not go into the merits of a case further than is necessary to determine whether the trial court exceeded a reasonable discretion in making the order, and this is especially true where the rights of the parties can be better determined upon full proof of the facts. Allen v. Omaha Live Stock Commission Co., 8 Cir., 275 F. 1. See also Benson Hotel Corporation v. Woods, 8 Cir., 168 F.2d 694.

On the balance of injury between the parties resulting from issuance of the temporary injunction in this case, it is obvious that if appellee's allegations in his bill of complaint are true, denial of the injunction would result in substantial and irreparable damage to him, while, on the other hand, the issuance of the temporary injunction would result in inconsiderable damage—if any—to appellants.

As to the issuance of the temporary injunction in violation of the Norris-LaGuardia Act, Title 29 U.S.C.A.

§ 101 et seq., we do not perceive that there was any controversy between the American Federation of Musicians and appellee involving, or growing out of, a labor dispute, within the meaning of the Act. Title 29 U.S.C.A. § 113.[1] In stating the followings facts, we are limited to the record which was before the district court. The controversy arose out of a breach of contract of a band leader to appear for a public performance. Pursuant to contract stipulations, the matter of liability and damages was submitted to the arbitration of the American Federation of Musicians. When the Federation took no action, appellee brought suit against the band leader and forced payment of damages by him. The Federation, because of appellee's action and recovery of damages against the band leader, placed appellee's name on its unfair list. The district court, in granting a temporary injunction to prevent irreparable injury, did not issue it in any case involving or growing out of a labor dispute.[2] On the record before us, the

1. Title 29 U.S.C.A. § 113, provides:
   "*Definitions of terms and words used in chapter*
   "When used in sections 101–115 of this title, and for the purposes of such sections—
   "(a) A case shall be held to involve or to grow out of a labor dispute when the case involves persons who are engaged in the same industry, trade, craft, or occupation; or have direct or indirect interests therein; or who are employees of the same employer; or who are members of the same or an affiliated organization of employers or employees; whether such dispute is (1) between one or more employers or associations of employers and one or more employees or associations of employees; (2) between one or more employers or associations of employers and one or more employers or associations of employers; or (3) between one or more employees or associations of employees and one or more employees or associations of employees; or when the case involves any conflicting or competing interests in a 'labor dispute' (as defined in this section) of 'persons participating or interested' therein (as defined in this section).
   "(b) A person or association shall be held to be a person participating or interested in a labor dispute if relief is sought against him or it, and if he or it is engaged in the same industry, trade, craft, or occupation in which such dispute occurs, or has a direct or indirect interest therein, or is a member, officer, or agent of any association composed in whole or in part of employers or employees engaged in such industry, trade, craft, or occupation.
   "(c) The term 'labor dispute' includes any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether or not the disputants stand in the proximate relation of employer and employee.
   "(d) The term 'court of the United States' means any court of the United States whose jurisdiction has been or may be conferred or defined or limited by Act of Congress, including the courts of the District of Columbia. Mar. 23, 1932, c. 90, § 13, 47 Stat. 73."

2. The Norris-LaGuardia Act curtailed the equity jurisdiction of federal courts in the field of labor disputes. Where the equity jurisdiction of the court is founded upon interstate and foreign commerce, it would seem that, in any event, the booking of an orchestra was not within the provisions of the Act. Contracts negotiated for vaudeville entertainment are for personal services and are not a subject of commerce under the Sherman Anti-Trust Act, 15 U.S.C.A. §§ 1–7, 15 note. Hart v. B. F. Keith Vaudeville Exchange, 2 Cir., 12 F.2d 341; see also Hart v. B. F. Keith Vaudeville Exchange, 262 U.S. 271, 43 S.Ct. 540, 67 L.Ed. 977. Contracts with baseball players are, likewise, for personal services and are not a subject of trade or commerce. Federal Baseball Club v. National League, 259 U.S. 200, 42 S.Ct. 465, 66 L.Ed. 898; Toolson v. New York Yankees, Inc., 346 U.S. 356, 74 S.Ct. 78. See also Title 15 U.S.C.A. § 12, for definition of "commerce" in Clayton Act, and Title 29 U.S.C.A., § 152, for definitions of "commerce" and "affecting commerce" in Labor-Management Relations Act. If the contract negotiated for the playing of an orchestra is for personal services, it would not come within the provisions of the Norris-LaGuardia Act, relating to labor disputes of which federal courts have jurisdiction under the commerce clause.

controversy between appellee and the band leader was a plain case of breach of contract. We have considered none of the affidavits purporting to show that the members of the band were employees and appellee was their employer, which were included in appellants' appendix, and which were filed subsequent to the order of the district court granting the temporary injunction, which have never been before the court for determination of any of the issues in the case. It is to be noted that even in cases where the Norris-LaGuardia Act is applicable, the district court, in certain circumstances, has the power to issue a restraining order for the purpose of preserving existing conditions, pending a decision on its own jurisdiction. United States v. United Mine Workers of America, 330 U.S. 258, 67 S.Ct. 677, 91 L.Ed. 884.

In ascertaining the propriety of the issuance of the temporary injunction in this case, we are, then, confronted, in the light of the authorities above mentioned, with the consideration whether the questions presented by this suit are grave and difficult. Appellee insists there is diversity of citizenship while appellants contend that the district court is without jurisdiction on grounds of diversity since the defendant, American Federation of Musicians, is an unincorporated association with its principal office in New York City, while many of its members are citizens of the same state as plaintiff-appellee; that the citizenship of an unincorporated association is that of its members; and that diversity does not exist if any of its members are citizens of the same state as is any adverse party to the action, citing Rosendale v. Phillips, 2 Cir., 87 F.2d 454; Levering & Garrigues Co. v. Morrin, 2 Cir., 61 F.2d 115; Ex parte Edelstein, 2 Cir., 30 F.2d 636. The Rosendale case held that a suit by an unincorporated membership association and certain of its officers and members against other members could not be maintained on grounds of diversity of citizenship unless all plaintiffs were of different citizenship than all defendants. In the Levering case, it was held that the actual residence of the individual members of an unincorporated labor union was determinative of the citizenship of the union for purposes of federal jurisdiction on grounds of diversity. In the Edelstein case, it was likewise held that the citizenship of an unincorporated union was that of its individual members. There was, however, a strong dissenting opinion to the effect that the nationwide extension of unincorporated bodies and their treatment as separate entities for collective bargaining and dealing provided new and different reasons for considering them as having a residence and a citizenship; and it was said that an unincorporated association would seem to have an equal claim to a status as a separate entity and citizenship separate from its members, as a corporation is regarded separately from its shareholders. This view was based upon the opinion of Chief Justice Taft in United Mine Workers v. Coronado Coal Co., 259 U.S. 344, 42 S.Ct. 570, 576, 66 L.Ed. 975, in which it was held that unincorporated labor unions, having been recognized as distinct entities by numerous acts of Congress, are suable, as such, in federal courts upon process served on their principal officers, for torts committed by them in strikes, and that their funds are subject to execution. Although the case was brought against the union, under the provisions of Sherman Anti-Trust Act, the conclusion of the court that a union was suable appears to have been based upon the general state of the law, and "the suability of the defendants is *confirmed* in the case at bar by the words of sections 7 and 8 of the Anti-Trust Law" (emphasis supplied). In Moffat Tunnel League v. United States, 289 U.S. 113, 53 S.Ct. 543, 77 L.Ed. 1069, it was held that a voluntary association had no capacity to sue to set aside an order of the Interstate Commerce Commission, unless authorized by statute.

However, according to Rule 17(b) of the Federal Rules of Civil Procedure, 28 U.S.C.A., the capacity of an unincorporated association to sue or to

be sued shall be determined by the law of the state in which the district court is held. The Federal Rules of Civil Procedure have the force and effect of statutes, and if there is conflict between procedure provided in an earlier act of Congress, and that provided by the rules, the former must yield to the latter; and all laws in conflict with such rules shall be of no further force and effect. Winsor v. Daumit, 7 Cir., 179 F.2d 475; Title 28 U.S.C.A. § 2071.

Unincorporated associations and organizations, resident or nonresident, doing business, or performing any of the acts for which they were formed, may be sued in the State of Tennessee, and service of process may be had upon their agents appointed for service of process, or upon the Secretary of State of Tennessee if such process agent is not appointed. Sections 8681.1, 8681.2, and 8681.3 of Williams Tennessee Code Annotated 1952 Cumulative Supplement. The Federal Rules of Civil Procedure also provide for service of process upon an unincorporated association which is subject to suit under a common name, and which is held to be sufficient if service is made in the manner prescribed by any statute of the United States or in the manner prescribed by the law of the state in which the service is made for the service of summons or other like process upon any such defendant in an action brought in the courts of general jurisdiction in that state. Rule 4(d) (3) and (7).

In cases where jurisdiction is founded on diversity of citizenship, it is a question whether an unincorporated labor union having the capacity to sue or to be sued in its own name, is to be considered a citizen of the state where its principal place of business is located. The Supreme Court has never passed upon the question. However, the rule that the citizenship of unincorporated associations generally is that of its members, seems to be losing its vitality. "There is some evidence * * * that the present federal rule is undergoing change, for the Supreme Court has treated a *sociedad en comandita* organized under Puerto Rico law as a citizen and resident of Puerto Rico for purposes of federal jurisdiction." Moore's Federal Practice, Volume 3, page 1413 (2d Edition).[3] In the case above referred to, People of Puerto Rico v. Russell & Co., 288 U.S. 476, 53 S.Ct. 447, 448, 77 L.Ed. 903, the court held that a *sociedad en comandita* under the laws of Puerto Rico was not a limited partnership in the common-law sense, but a juridical person, with a personality like that of a corporation, and that it had the status of a corporation for purposes of federal jurisdiction, that is, citizenship. The court observed that for almost a century, in ascertaining whether there was the requisite diversity

3. Professor Moore, however, also observes: "In order that the last sentence of Rule 17(b) be generally effective in cases where jurisdiction is founded upon diversity of citizenship the present federal rule on jurisdiction must be changed: the partnership or other unincorporated association which is given capacity to sue or be sued must be endowed with 'citizenship,' for purposes of federal jurisdiction. Such treatment might well be accorded them, and could be worked out along lines developed in the corporate field. But it should be clearly understood that this is a suggestion as to how the law should develop and not a statement as to present law." (Page 1413).

There are a number of authorities holding to the same effect as Rosendale v. Phillips, supra; Levering & Garrigues Co. v. Morrin, supra; and Ex parte Edelstein, supra. In Russell v. Central Labor Union, D.C.Ill., 1 F.2d 412, 414, in an opinion by Judge Lindley, it was said: "It is argued that, prior to 1844, corporations were not regarded as possessing the attributes of citizenship independent from that of their stockholders, and that the step forward then taken, recognizing them as separate entities and granting jurisdiction, upon the ground of diversity of citizenship, where the residence of the corporation was diverse to that of the opposing party, was only a forerunner of an equivalent development in the law governing voluntary associations. The logic of such reasoning is not without force, but such positive modification of the law should be made by the Supreme Court."

of citizenship to confer jurisdiction on the federal courts, it looked to the domicil of a corporation, not that of its individual stockholders, as controlling; that, in its final form, the rule of jurisdiction was stated in terms of a conclusive presumption that the stockholders were citizens of the state of the corporate domicil; but that the theoretical justification for the rule was found only in the complete legal personality with which corporations are endowed. The court said:

"This treatment of the aggregate for other purposes as a person distinct from its members, with capacity to perform all legal acts, made it possible and convenient to treat it so for purposes of federal jurisdiction as well. But status as a unit for purposes of suit alone, as *in the case of a joint-stock company, * * or a limited partnership*, not shown to have the other attributes of a corporation, * * * has been deemed a legal personality too incomplete; what was but an association of individuals for so many ends and a juridical entity for only a few, was not easily to be treated as if it were a single citizen.

"The tradition of the common law is to treat as legal persons only incorporated groups and to assimilate all others to partnerships. * * * The tradition of the civil law, as expressed in the Code of Puerto Rico, is otherwise. * * * In the law of its creation, the *sociedad* is consistently regarded as a juridical person." (Emphasis supplied.)

The court goes on to say that such a *sociedad* may contract, own property, and transact business, sue and be sued in its own name and right; that its members are not thought to have a sufficient personal interest in a suit brought against the entity to enable them to intervene as parties defendant; that it is created by articles of association filed as public records; that where the articles so provide, the *sociedad* endures for a period prescribed by them regardless of the death or withdrawal of individual members; that powers of management may be vested in managers designated by the articles from among the members whose participation is unlimited and that they alone may perform acts legally binding on the *sociedad*; that its members are not primarily liable for its acts and deeds, and its creditors are preferred with respect to its assets and property over the creditors of individual members, although the latter may reach the interests of individual members in the common capital; that although the members whose participation is unlimited are made contingently liable for the debts of the *sociedad* in the event that its assets are insufficient to satisfy them, this liability is of no more consequence for present purposes than that imposed on corporate stockholders by the statutes of some states; and that these characteristics, under the Codes of Puerto Rico, give content to their declaration that the *sociedad* is a juridical person. It is to be observed that the court stated that associations such as joint stock companies and limited partnerships had been deemed too incomplete as legal personalities to be treated as single citizens, but did not extend such an "incomplete" status to unincorporated labor unions.

The foregoing are the attributes which are pointed out by the Supreme Court as compelling the recognition of the Puerto Rican association as a juridical person, equivalent to a corporation, for purposes of citizenship, in cases in which jurisdiction is founded upon diversity of citizenship. But the attributes of unincorporated labor unions, which were pointed out by Chief Justice Taft in United Mine Workers v. Coronado Coal Co., 259 U.S. 344, 42 S.Ct. 570, 574, 66 L.Ed. 975, were much more impressive to compel recognition of unincorporated labor unions as juridical persons equivalent to corporations for purposes of citizenship in cases in which jurisdiction is founded upon diversity of citizenship. Thus, Chief Justice Taft pointed out that the unincorporated labor association there before the court was a national organization; that it was intended to be the

union of all workers employed in the particular industry in question, on the American continent; that its declared purpose was to increase wages and improve conditions of employment of its members by legislation, conciliation, joint agreement, and strikes; that it was composed of workmen eligible to membership, and was divided into districts, subdistricts, and local unions; that the ultimate authority was a general convention to which delegates selected by the members in their local organizations were elected; that the body governing the union in the interval between the conventions was a board consisting of the principal officers, the president, vice president, and secretary-treasurer, together with a member from each district; that the president had great power; that when the board was not in session, the individual members were obliged to do what he directed them to do; that the machinery of the organization was directed largely toward propaganda, conciliation of labor disputes, the making of scale agreements with employers, the discipline of officers, members, districts, and locals, and toward strikes and the maintenance of funds for that purpose; that it was admirably framed for unit action under the direction of the national officers; that it had a weekly journal, whose editor was appointed by the president, and which published all official orders and circulars, and all of the union news; that each local union was required to be a subscriber, and its official notices were to be brought by the secretary to the attention of the members; that the initiation fees and dues collected from each member were distributed between the national treasury, the district treasury, and that of the local; that the board was to prescribe conditions under which strikes were to be financed by the union and the amount of strike relief to be furnished the striking members; that the membership of the union had reached 450,000, and that the dues received from them for the na-

tional and district organizations made a very large annual total, and the obligations assumed in traveling expenses, holding of conventions, and general overhead cost, but most of all for strikes, were so heavy that an extensive financial business was carried on, money was borrowed, notes were given to banks, and in every way, the union acted as a business entity, distinct from its members.

On this aspect of the case, Chief Justice Taft concluded: "No organized corporation has greater unity of action, and in none is more power centered in the governing executive bodies."

The description of the attributes of the United Mine Workers of America, as related by Chief Justice Taft, may, upon the trial of the instant case, be found equally applicable to the American Federation of Musicians. Whether, in the light of People of Puerto Rico v. Russell & Co., supra, such national unions, with unity of action and power centered in their governing executive bodies, may be considered by the Supreme Court to be juridical persons equivalent to corporations for purposes of citizenship in cases in which jurisdiction is founded upon diversity of citizenship, is a question which, as far as this proceeding is concerned, is properly, in the first instance, subject to the consideration of the district court, where its determination, by virtue of the order of the court granting the preliminary injunction, abides the hearing.

Perhaps the most recent case in which the question has been determined is in Van Sant v. American Express Co., 3 Cir., 169 F.2d 355, 372, where a New York joint stock association was treated as a corporation for purposes of diversity and, hence, as a citizen of New York. In its opinion, the court observed (in a footnote) that the old rule "that generally speaking an unincorporated association has no citizenship for diversity purposes is itself beginning to show signs of being outmoded." [4]

4. That the entire law has changed within the last forty years, with relation to la-

bor unions and litigation, and the conception of a legal entity of an unincorpo-

With regard to whether there was compliance with Title 29 U.S.C.A. § 107, respecting the filing of findings of fact, this relates only to the issuance of injunctions in cases involving labor disputes under the Norris-LaGuardia Act, which is here inapplicable. It is to be said, however, that the district court, in its order issuing the injunction, set forth that, upon consideration of all matters presented, it appeared that "unless this temporary injunction issues, the plaintiff will suffer irreparable damages, inasmuch as his name will be carried on the 'unfair list' published monthly in defendant's official magazine, and which will prevent him from making contracts * * for the fall season, which will begin shortly."

As to the listing of appellee as "unfair," this was not done in the course of a labor dispute, nor did it arise out of a labor dispute. It is alleged, and not traversed, that the action of appellants constituted an automatic boycott; that it resulted in appellee's being totally prevented from carrying on his profession; that it was libelous, and done with the intent to injure and defame him, and to damage him in his business. If these allegations were proved, the circulation of the unfair list could not be said to be merely an expression of opinion. The law does not allow a citizen's rights to be destroyed under a perversion of freedom of speech. See Wisconsin Employment Relations Board v. Milk & Ice Cream Drivers & Dairy Employees Union, Local No. 225, 238 Wis. 379, 299 N.W. 31, certiorari denied Milk & Ice Cream Drivers and Dairy Employees Union, Local No. 225 v. Wisconsin Employment Relations Board, 316 U.S. 668, 62 S.Ct. 1035, 86 L.Ed. 1744.

Whether there was diversity of citizenship; whether the American Federation of Musicians was doing business in the State of Tennessee or subject to service of process there; whether it was

rated association as distinguishable from that of its members, is discussed in the interesting opinion of Chief Justice

suable by service upon Mr. Cooper as its representative—these and other questions going to the jurisdiction of the district court to entertain the case were grave and difficult, and justified the district court in its issuance of the preliminary injunction in order to reserve its decision on jurisdiction to a time when, after a hearing, adequate study and reflection would be afforded properly to interpret and apply the law.

In consideration of the foregoing, the order of Judge Davies, issuing the preliminary injunction, is sustained.

Groner in Busby v. Electric Utilities Employees Union, 79 U.S.App.D.C. 336, 147 F.2d 865.