In the Matter of MASON COUNTY MEDICAL ASSOCIATION, Mrs. Andrew C. Duke, Mrs. Hugh Blades, and Dr. Harry C. Denham, M.D., Plaintiffs-Appellants,

v.

John A. KNEBEL, Acting Secretary of Agriculture, United States Department of Agriculture, et al., Defendants-Appellees.

No. 77–1169.

United States Court of Appeals, Sixth Circuit.

Argued June 16, 1977.

Decided Sept. 20, 1977.

**258**

Robert E. Manley, Timothy A. Fischer, Cincinnati, Ohio, for plaintiffs-appellants.

William H. Haring, Sierra Club Legal Defense Fund, Inc., Denver, Colo., for amicus curiae Sierra Club.

C. Kilmer Combs, William E. Scent, Tarrant, Combs, Bullitt, Lexington, Ky., Bert T. Combs, Louisville, Ky., for East Ky. Power Cooperative.

Eldon Webb, U. S. Atty., Lexington, Ky., Peter R. Taft, Asst. Atty. Gen., Edmund B. Clark, Kathryn A. Oberly, Dept. of Justice, Washington, D. C., for federal defendants-appellees.

Before WEICK and PECK, Circuit Judges, and FREEMAN, Senior District Judge.*

WEICK, Circuit Judge.

The Mason County Medical Association and three named individuals (hereinafter collectively referred to as plaintiffs) have appealed from an interlocutory order of the District Court denying plaintiffs' motion for a preliminary injunction seeking to restrain "the Defendant federal agencies, their employees and agents, from granting any permits or approving any federally-guaranteed loans or from taking any other action in regard to" the proposed construction and operation of a 500-megawatt

(MW)[1] (nominal rating) coal-fired steam electric generating unit,[2] known as Spurlock Station Unit No. 2 (Spurlock No. 2). Spurlock No. 2 is to be located in Mason County, Kentucky, on the Ohio River approximately five miles northwest of Maysville, Kentucky, and the generating unit is to be constructed, owned, and operated by the state defendant, East Kentucky Power Cooperative, Inc. (EKP). No injunctive relief against EKP was sought in the District Court to restrain EKP from going forward with the construction of Spurlock No. 2. We affirm.

The pertinent facts in this case were accurately summarized by the District Court in its Findings of Fact Nos. 1–12 as follows:

### FINDINGS OF FACT

1) The plaintiffs are citizens and a public interest group having an interest in their environment in Mason County, Kentucky.

2) The defendant East Kentucky Power Cooperative, Inc. (hereinafter "EKP") is a generating and transmission cooperative supplying electric power and energy to 18 member distribution cooperatives serving approximately 214,000 customers. EKP is a member of the Kentucky-Indiana Pool (hereinafter "KIP") which was formed to jointly solve power supply problems in the service areas. Other participants in the pool are Indianapolis Power and Light Co., Kentucky Utilities Co., and the Public Service Commission of Indiana, Inc. KIP is responsible for coordination and planning of generation and transmission facilities for delivering of bulk power to load centers.

3) EKP proposes to construct 500 MW (nominal rating) coal-fired steam electric generating unit (Spurlock Unit No. 2) at its existing Spurlock station in Mason County, Kentucky, a related substation, and related transmission lines from the station to the

---

\* The Honorable Ralph M. Freeman, Senior Judge, United States District Court for the Eastern District of Michigan, sitting by designation.

1. A megawatt is 1,000 kilowatts.

2. A coal-fired steam electric generation system utilizes the heat formed by the combustion of coal to produce steam. The steam drives a steam turbine which, in turn, drives an electrical generator producing electricity. Other fossil fuels commonly used in such systems are oil and natural gas.

new Avon substation and to the Stuart generating station. The proposed Spurlock Unit No. 2 will form an integral part of the KIP system.

4) In 1974 EKP applied to the defendant Rural Electrification Administration (REA) for a loan guarantee in the amount of $380,000,000 to finance the construction of Spurlock Unit No. 2 and associated 345 KV transmission lines. At preliminary meetings between REA and EKP in 1974 and 1975, it was determined that an Environmental Impact Statement (EIS) would be required. The requirement for project justification and for the Environmental Analysis to be submitted by EKP to REA were discussed.

5) A Notice was published on July 7, 1974, in the Federal Register stating REA's intent to prepare an EIS on the proposed project and requesting information from interested parties to aid in preparation of the EIS. Notices to that effect were also published in newspapers circulated in the project areas. No comments were received.

6) In May 1975 a preliminary Environmental Analysis was submitted to REA for review. After review and discussion, additional material was added to the Environmental Analysis. The Environmental Analysis included a description of the proposed project, the impact of the proposed project on the environment, favorable environmental effect of the proposed action, adverse environmental effects which cannot be avoided if the proposed facilities are constructed, alternatives to the proposed action, the relationship between short-term uses of man's environment and enhancement of long-term productivity, any irreversible or irretrievable commitments of natural, cultural and other resources which would be involved in implementation of the proposed project.

7) REA independently examined the proposed site early in 1976 to obtain firsthand information regarding environmental aspects of the area involved. The defendant Environmental Protection Agency (EPA) Region IV agreed with REA to issue a joint EIS to serve both parties in order to avoid duplication of effort and it was agreed between them that REA would be the lead agency for the project.

8) After receipt of an acceptable Environmental Analysis, REA prepared a draft EIS which incorporated EKP's Environmental Analysis in preparing the draft EIS. REA evaluated material submitted by EKP and EKP's consulting engineer and examined the anticipated environmental effect of the project in light of the need for power and anticipated beneficial effects. Alternatives such as no additional power, purchased power, alternate sites, alternate generation and fuels, alternate ash and sludge disposal, alternative transmission line construction and voltage, and alternative transmission line tower construction were considered.

9) EPA independently reviewed the Environmental Analysis submitted by EKP and had significant input into REA's draft EIS. EPA independently performed an air quality modeling analysis and independently investigated compliance with EPA regulations for Prevention of Significant Deterioration of Air Quality. The air quality modeling analysis together with the draft National Pollution Discharge Elimination (NPDES) Permit were made a part of the draft EIS. The draft EIS was issued in April 1976 and the public was requested to comment. Written comments were received on the EIS. The Federal Power Commission (FPC) was also requested to comment on the draft EIS and the need for power stated therein. On June 10, 1976, the Bureau of Power of the FPC by letter stated that the additional capacity represented by Spurlock Unit No. 2 was needed to maintain the adequacy and reliability of KIP's bulk power system. It also concluded that the proposed electric power transmission facilities were necessary to transmit electric energy from the Spurlock station to the load center. A public hearing on the project was held in August of 1976 that was chaired jointly by REA, EPA and the State of Kentucky.

10) The Public Service Commission of Kentucky issued a "Certificate of Public Convenience and Necessity" to EKP for

construction of the project. Prior to issuance of that certificate the Public Service Commission granted to EKP a "Certificate of Environmental Compatibility." The latter certificate was issued only after EKP submitted to the Kentucky Department for Natural Resources and Environmental Protection a "Statement of Environmental Compatibility of the Proposed Site" and the Department for Natural Resources and Environmental Protection after review and the public hearing found that the proposed addition could be built and operated in compliance with all Kentucky statutes and regulations relating to the authority of that department. In addition, the PSC issued to EKP a certificate of right to borrow funds from the Federal Finance Bank, the loan to be guaranteed by the REA.

11) Agency and public comments received on the draft EIS were answered and included in the final EIS.

12) The final EIS was submitted to the Council on Environmental Quality on December 3, 1976. In the final EIS there is stated over the signature of the Administrator of the REA the following:

". . . It is my judgment that the proposed action by the Rural Electrification Administration in providing financing for the proposed construction will be consistent with the policy set forth in the National Environmental Policy Act."

On December 20, 1976, the plaintiffs filed a 31-page complaint in the District Court against the United States Department of Agriculture, the REA (a department of the U.S. Department of Agriculture), the EPA, certain federal administrators, and the state defendant, EKP. The complaint primarily[3] alleged that the final EIS, which was prepared and issued jointly by REA and EPA, was insufficient as a matter of law in that it did not comply with the requirements of the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321 et

seq., and certain guidelines promulgated by the Council on Environmental Quality (CEQ), 40 C.F.R. §§ 1500 et seq. Plaintiffs prayed that the District Court, inter alia, issue a permanent injunction enjoining the federal defendants from "issuing any permits or from approving any federally guaranteed loans incident to the construction or operation" of Spurlock No. 2 until the defendants' EIS complied with the requirements of NEPA and with the CEQ guidelines. Shortly after the filing of the complaint, plaintiffs filed a motion for a preliminary injunction seeking to enjoin the federal defendants from taking any action with respect to Spurlock No. 2 "which would alter the status quo" pending a final determination of the underlying cause of action.

Upon consideration of the parties' memoranda and supporting affidavits and the oral arguments of counsel, the District Court, on February 24, 1977, denied the plaintiffs' motion for a preliminary injunction, adopting findings of fact and conclusions of law.

Plaintiffs filed a notice of appeal and also moved this Court for a preliminary injunction pending appeal, which motion was denied by order of this Court on March 17, 1977.

Following the entry of the District Court's order, EKP proceeded with construction of Spurlock No. 2 and EKP received a loan guarantee certificate from REA in early March, 1977. As of May 20, 1977, EKP had received loan monies from the Federal Finance Bank totalling $29,-005,000, and EKP had awarded construction and engineering contracts totalling $150,-000,000. EKP also received its NPDES Permit for Spurlock No. 2 from the EPA on March 4, 1977.

I.

■ It is well settled that the scope of review on appeal from the denial or grant-

---

3. Plaintiffs also alleged noncompliance with the Clean Air Act, 42 U.S.C. §§ 1857 et seq., and the Federal Water Pollution Control Act, as amended, 33 U.S.C. §§ 1251 et seq. On appeal, however, the parties' arguments have been limited to the alleged noncompliance with the requirements of NEPA and, accordingly, in our decision we deal solely with these alleged violations of NEPA.

ing of a preliminary injunction is limited to a determination of whether the District Court abused its discretion. As this Court stated in *Adams v. Federal Express Corp.*, 547 F.2d 319, 322 (6th Cir. 1976):

> The granting or denial of a preliminary injunction is within the sound judicial discretion of the trial court. *Virginia Railway Co. v. System Federation, R.E.D.*, 300 U.S. 515, 551, 57 S.Ct. 592, 81 L.Ed. 789 (1937); *Brandeis Machinery & Supply Corp. v. Barber-Greene Co.*, 503 F.2d 503 (6th Cir. 1974); *North Avondale Neighborhood Ass'n v. Cincinnati Metropolitan Housing Authority*, 464 F.2d 486 (6th Cir. 1972); *Hornback v. Brotherhood of Railroad Signalmen*, 346 F.2d 161 (6th Cir. 1965). On appeal the denial of such an injunction will not be disturbed unless contrary to some rule of equity or an abuse of discretion. *United States v. Corrick*, 298 U.S. 435, 56 S.Ct. 829, 80 L.Ed. 1263 (1936); *Nashville I–40 Steering Committee v. Ellington*, 387 F.2d 179 (6th Cir. 1967).

*See also Com-Share, Inc. v. Computer Complex, Inc.*, 458 F.2d 1341, 1342 (6th Cir. 1972); *Oliver v. School Dist. of City of Kalamazoo*, 448 F.2d 635, 636 (6th Cir. 1971); *American Fed'n of Musicians v. Stein*, 213 F.2d 679, 683 (6th Cir.), *cert. denied*, 348 U.S. 873, 75 S.Ct. 108, 99 L.Ed. 687 (1954).

■ In determining on appeal whether the District Court abused its discretion in granting or withholding preliminary injunctive relief, this Court has set forth four standards which must be considered:

1) Whether the plaintiffs have shown a strong or substantial likelihood or probability of success on the merits;

2) Whether the plaintiffs have shown irreparable injury;

3) Whether the issuance of a preliminary injunction would cause substantial harm to others;

4) Whether the public interest would be served by issuing a preliminary injunction.

*Adams v. Federal Express Corp., supra* at 323; *Cincinnati Electronics Corp. v. Kleppe*, 509 F.2d 1080, 1087 (6th Cir. 1975); *North Avondale Neighborhood Ass'n v. Cincinnati Metropolitan Housing Authority, supra* at 488; *Garlock, Inc., v. United Seal, Inc.,*. 404 F.2d 256, 257 (6th Cir. 1968); *American Fed'n of Musicians v. Stein, supra. See also Blaylock v. Cheker Oil Co.*, 547 F.2d 962, 965 (6th Cir. 1976); *Public Interest Research Group of Mich. v. Brinegar*, 517 F.2d 917, 918 (6th Cir. 1975). *Cf. Ohio v. Callaway*, 497 F.2d 1235, 1241 (6th Cir. 1975), *SEC v. Senex Corp.*, 534 F.2d 1240, 1241 (6th Cir. 1976).[4]

■ We recognize, of course, as stated in *Adams v. Federal Express Corp., supra,* that—

> [I]n view of our limited scope of review, we do not consider the merits of the case further than to determine whether the District Judge abused his discretion in denying the preliminary injunction.

*See also Blaylock v. Cheker Oil Co., supra* at 964; *SEC v. Senex Corp., supra; Brandeis Mach. and Supply Corp. v. Barber-Greene Co., supra* at 505; *Garlock, Inc. v. United Seal, Inc., supra; Hornback v. Brotherhood of R.R. Signalmen, supra* at 164; *American Fed'n of Musicians v. Stein, supra.* The District Court appropriately did not adjudicate the merits of the plaintiffs' underlying cause of action which alleged various deficiencies in the final EIS, but the District Court did specifically hold, *inter alia,* that "the likelihood of success by the plaintiffs on the merits of the case is remote," and accordingly denied the plaintiffs' motion for a preliminary injunction. It is the propriety of this finding by the District Court relative to this first crucial element for determining whether a preliminary injunc-

---

**4.** In these two decisions, *Ohio v. Callaway, supra,* and *SEC v. Senex Corp., supra,* this Court used unfortunate terminology when it stated that one of the four standards or prerequisites for the equitable relief of a preliminary injunction is that there must be a "possibility" of success on the merits. A showing of a mere "possibility" of success would render the test for a preliminary injunction virtually meaningless. Therefore, we reiterate that the plaintiffs must demonstrate a strong or substantial *likelihood* or *probability* of success on the merits.

**262**

tion should be granted which constitutes the gist of this appeal. Therefore, although the immediate issue before this Court is whether or not the District Court abused its discretion in denying the preliminary injunction, it must be recognized that the underlying issue concerns the sufficiency of the final EIS which, in the words of the Administrator of the REA, described "the expected environmental effects of the construction and operation" of Spurlock No. 2.

## II.

Section 102(2)(C) of NEPA, 42 U.S.C. § 4332(2)(C) provides in pertinent part that "all agencies of the Federal Government shall":

(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

Section 102(2)(E) further requires all federal agencies to:

study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources.

■ The plaintiffs' main contention in District Court and on appeal is that the EIS is insufficient under §§ 102(2)(C)(iii) and 102(2)(E) of NEPA and under various guidelines promulgated by the CEQ because it "fails to adequately discuss or seriously consider the alternative of purchasing winter peak power" from nearby "summer-peaking" utilities [5] such as Cincinnati Gas & Electric Co., Dayton Power & Light Co., Columbus & Southern Ohio Electric Co., and Ohio Power Co.

■ The District Court determined in its Finding of Fact No. 15 as follows:

15) Purchase of power from other sources including investor-owned utilities was considered in the final EIS. The determination made by the REA Administrator that the various studies made available to him demonstrated the need for immediate construction of Spurlock Unit No. 2 and related transmission facilities in order to meet EKP's projected power requirements and its commitments as a member of KIP is supported by substantial evidence.

We agree.

An examination of the EIS, which consists of over one-thousand (1,000) pages including the appendices, two Environmental Analyses prepared by EKP and incorporated into the final EIS, and the public hearing transcript, reveals that the alternative of purchased power was discussed in Section 5.2 (p. 75) of the EIS; in Appendix C–1 entitled "Power Supply Alternatives" (pp. C–1–1 through C–1–6); and in Section V of the Environmental Analysis of the proposed Spurlock No. 2 Generating Unit (pp. V–1 through V–10 and V–17). The EIS at Appendix C–1–1 states that EKP "must provide additional generation and/or purchase power in the amount of 300 MW by 1980 and 2,700 MW by 1989, to cover its projected capacity requirements under the terms of the KIP Agreement." Furthermore, the EIS states that it is estimated that EKP will be deficient in generating capacity by 287 MW in 1980, by 1049 MW in 1984, and by 2681 MW in 1989. With these energy needs of EKP and KIP in mind, the above

---

5. Summer-peaking utilities experience a maximum load or demand on their systems during the summer months. EKP, in contrast, experi-

ences its peak loads in the winter, and thus is a winter-peaking utility.

discussions in the EIS essentially state that purchasing power from other utilities is not a feasible alternative to construction of Spurlock No. 2 for the following reasons: (1) "[L]arge scale power purchasing" within KIP is not possible because each pool member is required to maintain sufficient generating capacity to meet individual and pool needs, and no member should be "dependent on the others for a disproportionate amount of its capacity requirements." This position was fortified by the June, 1976, letter from the Federal Power Commission to the REA which stated:

> The Bureau of Power concludes that the additional capacity represented by Spurlock Unit No. 2 is needed to maintain the adequacy and reliability of KIP's bulk power system . . .. (EIS, p. 222)

(2) The Southeastern Power Administration (SEPA) is unable to supply large amounts of firm purchased power to EKP. Rather, the only capacity available to EKP from SEPA is the 100 MW of peaking capacity which EKP is already purchasing from SEPA and perhaps another 35 MW which may be available from SEPA's Laurel hydroelectric project; (3) The Tennessee Valley Authority (TVA), which operates in areas adjacent to the EKP service area, has "a policy of not selling long-term, base load, firm power to electric systems outside its service area." "The only power which TVA might have available would be short-term power available on a year-to-year basis" and this would not meet EKP's needs; (4) Nearby utilities (excluding other KIP members) which were contacted, *i. e.,* Louisville Gas & Electric, Cincinnati Gas & Electric, and Kentucky Power Co., have not "shown an interest in selling power to EKP on a long-term basis," primarily because of their own financial problems and the uncertainty of their load forecasts; in fact, the affidavit of Richard H. Breckenkamp, Manager of Engineering for EKP, stated that several Southern Ohio utilities had real difficulty in supplying their own customers during the Winter of 1977. (5) "[P]urchasing power would require another utility to install and maintain the necessary generating facilities" and "the environmental effects of construction and operation would be similar [to the effects of construction of Spurlock No. 2] although a different locale would be affected"; (6) "[P]urchase of capacity from the investor-owned utilities would be based on their fixed charge rates . . . [which] are much greater than East Kentucky's [EKP's] fixed charge rates, primarily because of financing, rate of return, and income tax requirements"; (7) "[N]one of the existing [three] municipal generating facilities [only one of which is located in the EKP service area] could now supply East Kentucky with the amount of power it must produce if generating capacity is not installed."

Furthermore, the EIS contains a discussion of various other alternatives to the proposed construction and operation of Spurlock No. 2 at pp. 74–87 of the EIS; in Appendix C–1; and in Section V of the Environmental Analysis of Spurlock No. 2. The following alternatives were considered: (1) No additional power; (2) Alternate sites; (3) Alternate generation and fuels, *i. e.,* nuclear-steam electric; fossil-steam electric (coal oil, natural gas) including a consideration of the use of various grades of coal and the use of coal gasification; hydroelectric; geothermal; combustion turbine; solar; and wind; (4) Energy conservation measures; and (5) Shared units with other utilities.

■ We have considered the lengthy record of the case no further "than to determine whether the District Judge abused his discretion in denying the preliminary injunction," *Adams v. Federal Express Corp., supra.* Our careful review of the record, including the briefs, appendices, and oral arguments of the parties, reveals that the EIS contains adequate discussion of all of the reasonable alternatives to the proposed construction and operation of Spurlock No. 2. Indeed, it is well settled that only those alternatives that are reasonable need be examined, and as stated by the Eighth Circuit in *Robinson v. Knebel,* 550 F.2d 422, 425 (8th Cir. 1977):

The discussion of alternatives need not be exhaustive if the impact statement presents sufficient information for a reasoned choice of alternatives.

*See also Concerned About Trident v. Rumsfeld,* 555 F.2d 817, 825, 829 (D.C. Cir. 1977); *Minnesota Pub. Interest Research Group v. Butz,* 541 F.2d 1292, 1300 (8th Cir. 1976); *Cady v. Morton,* 527 F.2d 786, 797 (9th Cir. 1975); *Natural Resources Defense Council v. Callaway,* 524 F.2d 79, 93 (2d Cir. 1975); *Cummington Preservation Comm. v. FAA,* 524 F.2d 241, 244 (1st Cir. 1975); *Carolina Environmental Study Group v. United States,* 166 U.S.App.D.C. 416, 510 F.2d 796, 801 (1975); *Natural Resources Defense Council, Inc. v. Morton,* 148 U.S.App.D.C. 5, 458 F.2d 827, 836–37 (1972).

■ There has been no trial of the merits of the case in the District Court, and the issues remain yet to be determined. We are of the opinion that the plaintiffs have not demonstrated to us that there is a strong or substantial likelihood or probability of success on the merits with regard to the alleged deficiencies in the treatment in the EIS of the alternatives to the proposed action. Nor have plaintiffs demonstrated a probability of success on the merits with regard to the other alleged deficiencies in the EIS such as the alleged failure to address the "cumulative and synergistic impact" which Spurlock No. 2 will have in combination with other existing and proposed power plants in the Ohio River Valley on the air quality of that region.

Furthermore, although we are not unmindful of the claims of potential harm to plaintiffs by the apparent continuation of the construction of Spurlock No. 2, we have also considered the injury that would result to the defendants, in particular EKP, from the issuance of a preliminary injunction because of EKP's large financial commitments to the project. After carefully balancing the four factors involved in a determination as to whether a preliminary injunction should issue, including the public interest in maintaining adequate energy resources in the EKP service area, we are of the opinion that the District Court did not abuse its discretion in denying the preliminary injunction.

Finally, we note that the District Court in its Conclusion of Law No. 4(a) stated as follows:

(a) the final Environmental Impact Statement issued by the REA relative to Spurlock Unit No. 2, substantially conforms to the requirements of the National Environmental Policy Act and the regulations promulgated by the Council on Environmental Quality 40 C.F.R. 1500.1 et seq.

Plaintiffs contend that the District Court's use of the term "substantially" applies the wrong standard as it is well established that "strict" compliance with NEPA is required. *Environmental Defense Fund v. TVA,* 468 F.2d 1164, 1174 (6th Cir. 1972), *quoting Calvert Cliffs' Coordinating Comm. v. AEC,* 146 U.S.App.D.C. 33, 449 F.2d 1109, 1112 (1971); *Daly v. Volpe,* 350 F.Supp. 252, 257–58 (W.D.Wash.1972).

■ We regard this contention as a play on words. The District Court was not ruling on the merits of the case but only on a motion for preliminary injunction. When the District Court tries the case on its merits and hears the evidence it is probable that the EIS will turn out to be sufficient even under a standard of "strict" compliance. Moreover, it is equally well established that although an agency must have taken "a 'hard look' at environmental consequences" this requirement is "tempered by a practical 'rule of reason.'" *New York v. Kleppe,* 429 U.S. 1307, 1311 & n. 1, 97 S.Ct. 4, 50 L.Ed.2d 38 (1976) (Marshall, J., in chambers) (citing cases). *See also Kleppe v. Sierra Club,* 427 U.S. 390, 410 n. 21, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976). As this Court stated in *Natural Resources Defense Council, Inc. v. TVA,* 502 F.2d 852, 853–54 (6th Cir. 1974):

Although the NEPA is an environmental full disclosure law, its interpretation is, nevertheless, tempered by a rule of reason. *See, e. g., Environmental Defense Fund, Inc. v. Corps. of Engineers of the United States Army,* 492 F.2d 1123, 1131 (5th Cir. 1974); *Environmental De-*

*fense Fund v. Tennessee Valley Authority*, 492 F.2d 466, 468, n. 1 (6th Cir. 1974); *Natural Resources Defense Council, Inc. v. Morton, supra*, 458 F.2d at 834. "[I]t is entirely unreasonable to think that Congress intended for an impact statement to document every particle of knowledge that an agency might compile in considering the proposed action." *Environmental Defense Fund, Inc., supra*, 492 F.2d at 1136.

■ We find no evidence that either REA or EPA acted unreasonably or arbitrarily in connection with the preparation and issuance of the EIS which was completed only after careful and extensive investigation. In this technical field REA and EPA surely had expertise. But no matter how well the EIS has been written, someone later can always find fault with it. We would question whether a perfect EIS has ever been prepared. *See Natural Resources Defense Council, Inc. v. TVA, supra* at 854; *Environmental Defense Fund v. TVA, supra* at 468 & n. 1.

We are of the opinion that the findings of fact adopted by the District Judge are supported by substantial evidence and are not clearly erroneous. His conclusions of law were also correct.

We also note the previous ruling of this Court denying appellant's motion for a preliminary injunction pending appeal.

Accordingly, the judgment of the District Court denying the plaintiffs' motion for a preliminary injunction is affirmed.