The **PROCTER & GAMBLE COMPANY,**
Plaintiff–Appellee,

v.

**BANKERS TRUST COMPANY,**
BT Securities Corporation,
Defendants–Appellees,

**The McGraw–Hill Companies,**
Inc., Appellant.

No. 95–4078.

United States Court of Appeals,
Sixth Circuit.

Argued Dec. 6, 1995.

Decided March 5, 1996.

Rehearing and Suggestion for Rehearing
En Banc Denied May 8, 1996.*

---

* Judge Brown dissents for the reasons stated in his dissenting opinion.

John D. Luken (argued), Thomas S. Calder (briefed), Dinsmore & Shohl, Cincinnati, OH, Matthew Gluck, Fried, Frank, Harris, Shriver & Jacobson, New York City, Stanley M. Chesley, Waite, Schneider, Bayless & Chesley, Cincinnati, OH, for Plaintiff-Appellee.

Thomas B. Ridgley (argued and briefed), Vorys, Sater, Seymour & Pease, Columbus, OH, Daniel J. Buckley, Vorys, Sater, Seymour & Pease, Cincinnati, OH, Michael E. Wiles, Debevoise & Plimpton, New York City, for Defendants-Appellees.

Richard M. Goehler (briefed), Susan Grogan Faller, Frost & Jacobs, Cincinnati, OH, Laura Handman, New York City, Victor A. Kovner (argued and briefed), Robert D. Balin, Lankenau, Kovner & Kurtz, New York City, for Appellant.

Robert D. Sack (argued), Gibson, Dunn & Crutcher, New York City, Theodore J. Boutrous, Jr. (briefed), Gibson, Dunn & Crutcher, Washington, DC, for amici curiae Dow Jones and Co., Cincinnati Enquirer, Los Angeles Times, Newsday, American Society of Newspaper Editors.

Richard L. Klein (briefed), New York City, for amicus curiae Bloomberg L.P.

William M. Saks (briefed), American Civil Liberties Union of Ohio Foundation, Cleveland, OH, for amici curiae American Civil Liberties Union, American Civil Liberties Union of Ohio Foundation, Inc.

David L. Marburger (briefed), Baker & Hostetler, Cleveland, OH, for amici curiae E.W. Scripps Co., et al.

Before: MERRITT, Chief Judge; BROWN and MARTIN, Circuit Judges.

MERRITT, C.J., delivered the opinion of the court, in which MARTIN, J., joined, with MARTIN, J. (pp. 227–28), also delivering a separate concurring opinion. BROWN, J. (pp. 229–32), delivered a separate dissenting opinion.

MERRITT, Chief Judge.

In a case of widespread interest to the press, the District Court issued an injunction prohibiting *Business Week* magazine from publishing an article disclosing the contents of documents placed under the seal of secrecy by the parties to a lawsuit. This appeal raises the issue of whether the bedrock First Amendment principle that the press shall not be subjected to prior restraints can be set aside when a federal court perceives a threat to the secrecy of material placed under seal by stipulation of the parties. We are guided by the holding of the First Circuit in *In the Matter of Providence Journal Company* that even a temporary restraint on pure speech is improper "absent the most compelling circumstances." 820 F.2d 1342, 1351, *modified on reh'g by* 820 F.2d 1354 (1st Cir.1986), *cert. granted and dismissed on other grounds*. Such circumstances are not present in the case at bar, and we therefore hold that the District Court erred in granting the orders challenged here.

The District Court maintained its prior restraint on publication for three weeks by successive injunctive orders. It then sought to avoid review under the mootness doctrine by entering a permanent injunction against publishing the original secret documents while simultaneously making photocopies public. The case is not moot because the permanent injunction against publication of the original documents remains in effect and because temporary restraints on speech fall within the well-recognized exception to moot-

ness for wrongs that are "capable of repetition, yet evading review." See *Southern Pacific Terminal Co. v. ICC*, 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911).

## I. Facts

On October 27, 1994, Procter & Gamble ("P & G") filed a complaint against Bankers Trust[1] ("Bankers") claiming a loss of over $100 million due to alleged fraud by Bankers in the sale of derivatives to P & G. The case has received widespread coverage, especially in the business press.

In January of 1995, Bankers and P & G agreed to a broad stipulated protective order as part of the discovery process. The order provided that parties and non-parties to the litigation—without court approval for "good cause" as required by Rule 26(e) of the Civil Rules—could, in their discretion, designate discovery material as "confidential" and could have such material filed under seal if the parties agreed that it reflected "trade secrets or other confidential research, development or commercial information...." J.A. at 14. The parties and not the court would determine whether particular documents met the requirements of Rule 26. The protective order further provided that the parties could modify its terms without approval of the court. J.A. at 21. The presiding judge, the late Judge Carl Rubin during his terminal illness, signed the stipulated order allowing the parties to conduct the discovery process in secret. Judge John Feikens, the former Chief Judge of the Eastern District of Michigan, was assigned the case after Judge Rubin's death, and he therefore inherited this unusual protective order and the voluminous set of documents already filed under the seal of secrecy.

Without notice to *Business Week* or a request for a hearing, on Wednesday, September 13, 1995, Bankers and P & G alerted Judge Feikens that *Business Week*, a magazine owned by McGraw–Hill, had obtained documents from the Bankers/P & G litigation that the parties wanted to remain secret. The documents in question were materials supporting a motion by P & G for leave to amend its complaint. Although the motion itself was not sealed, the accompanying documents, which contained a supporting memorandum of law, a proposed Second Amended Complaint containing RICO allegations, and a RICO case statement, were filed in secret pursuant to the protective order. Neither Bankers nor P & G could say at that time how *Business Week* had obtained the documents.

Shortly before six o'clock, again without notice or a hearing, Judge Feikens—at the urgent request of both parties—transmitted by facsimile an order to McGraw–Hill enjoining and prohibiting them from publishing the documents without consent of the court. It stated that the parties would "suffer irreparable harm" if the documents were disclosed, but it did not state a reason. The order was open-ended in duration and did not set a date for a hearing. *Business Week* obeyed the order, pulling its story before its nine p.m. publication deadline.

The following day, September 14, McGraw–Hill filed for a stay of the District Court order and an expedited appeal with the Sixth Circuit. A Sixth Circuit panel heard oral argument and on Tuesday, September 19, dismissed the appeal on the grounds that the order could "best be characterized as a temporary restraining order" and was therefore not a final order and not appealable. The panel did not treat the order as a request for mandamus or exercise its discretion by mandamus to set aside the prior restraint. Later that day, McGraw–Hill sought an emergency stay from Justice Stevens of the United States Supreme Court.

On September 21, Justice Stevens denied the stay, stating that the wiser course would be to return to the District Court for a fact-finding hearing on the matter. That same day, the District Court commenced what would be a two-day hearing to determine how the documents had been obtained and whether the injunction should remain in place. On September 22, ten days after the

---

**1.** The suit was filed against both Bankers Trust and an affiliate, BT Securities. This opinion will refer to them collectively as "Bankers."

original injunctive order, the District Court entered another order extending the September 13th order for another ten days and conducted more hearings.

The hearings revealed that the documents had found their way to *Business Week* through an unusual chain of people and events. *Business Week's* editor on the story, Zachary Schiller, testified on the basis of his reporter's notes to a tantalizing, off-the-record phone call from an employee in the public relations department of P & G who suggested that some documents that would be of interest to *Business Week* were about to be filed at the courthouse. (It seems that the tactics of P & G's public relations office were a little different from those of its lawyers.) Schiller notified several *Business Week* journalists that he was seeking information about the mysterious filing.

While Schiller was away from his office, a New York-based journalist for *Business Week* contacted an acquaintance who was a partner at the New York law firm representing Bankers Trust. Neither the partner (who was not working on the P & G case) nor the journalist (who had not previously been covering the story), appeared to know that the material was under seal. The journalist simply asked for the documents, and the partner obtained copies and gave them to her. The circle of irony became complete. Banker's New York lawyers unwittingly also followed tactics different from those of its litigators. It appears that *Business Week* found out about the sealed material because of a P & G leak and got the documents through a leak from Banker's Trust.

With this information before it, the District Court entered two orders on October 3rd, three weeks after its initial order restraining publication. In one order, the District Court concluded that *Business Week* "knowingly violated the protective order" by obtaining the documents and was therefore prohibited and permanently enjoined from using "the confidential materials that it obtained unlawfully." J.A. at 49. ("I conclude as a matter of law that *Business Week* cannot be permitted to use the confidential materials it obtained to publish its story." J.A. at 47.) This injunction remains in effect. In the other order, the District Court determined that, because the parties could not provide a "substantial government interest" in keeping the documents confidential, "the sealed documents should no longer be protected" and should be released into the public domain. J.A. at 33–34.

## II. Analysis

### A. Mootness

■ The first issue requiring analysis is whether Judge Feikens' order unsealing the documents and releasing them into the public domain renders the present case moot. Although it might at first appear so, the Supreme Court has long recognized an exception to the mootness doctrine for wrongs "capable of repetition, yet evading review." *Southern Pacific Terminal Co. v. ICC*, 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911); *see also Nebraska Press Assn. v. Stuart*, 427 U.S. 539, 546, 96 S.Ct. 2791, 2796–97, 49 L.Ed.2d 683 (1976). The initial restraining orders meet both criteria and therefore fall within the exception.

■ The "capable of repetition" requirement is satisfied by the "reasonable expectation" that the same complainant will be subject to similar action in the future. *Globe Newspaper v. Superior Court*, 457 U.S. 596, 603, 102 S.Ct. 2613, 2618, 73 L.Ed.2d 248 (1982) (newspaper serving Boston metropolitan area would "someday be subjected to another order" based on the same contested rule); *Gannett Co. v. DePasquale*, 443 U.S. 368, 377–78, 99 S.Ct. 2898, 2904, 61 L.Ed.2d 608 (1979) ("capable of repetition" requirement satisfied by reasonable expectation that publisher of New York newspapers would be subject to similar orders by New York courts). Here, the underlying case between Bankers and P & G continues and the protective order remains in place. The parties will probably want to continue to keep the details of the case undisclosed. This creates a reasonable and ongoing expectation that another conflict may arise between the desire of the private litigants to keep their dispute out of the public eye and McGraw–Hill's interest in reporting on matters of public concern. The increasing, routine use of protective orders in the courts only assures that challenges of

this type will continue to occur. *See* Hendricks & Moch, *Protective Orders: The Industry's Silencer on the Smoking Gun,* 73 Mich.B.J. 424 (May, 1994) ("Corporate defendants now seek protective orders as a matter of routine.").

■ With respect to the "evading review" prong, the initial restraining orders satisfy the requirement. The temporary restraining orders are inherently of a "duration too short to be fully litigated." *See, e.g., Gannett,* 443 U.S. at 377, 99 S.Ct. at 2904 ("evading review" test met where "the challenged action [is] in its duration too short to be fully litigated prior to its cessation or expiration."). *See also, Carroll v. President and Comm'rs of Princess Anne,* 393 U.S. 175, 177–179, 89 S.Ct. 347, 349–351, 21 L.Ed.2d 325 (1968) (issues raised by expired ten-day restraining order not moot). Consequently, important procedural issues raised by the unusual circumstances of a prior restraint, including how quickly the judge must act, whether *ex parte* action is permitted, and whether there must be a hearing in which a court addresses a TRO petition, would always evade review absent this exception to mootness. To say that a prior restraint for three weeks by TRO is moot after dissolution would mean that a district court may create an unreasonable three-week exception to the prior restraint rule. *Ex parte* prior restraints without a hearing are equally unreviewable. Because "each passing day may constitute a separate and cognizable infringement of the First Amendment," *Nebraska Press Assn.,* 423 U.S. 1327, 1329, 96 S.Ct. 251, 254, 46 L.Ed.2d 237 (1975) (Blackmun, J., in chambers) our ability to review even a temporary restraint on pure speech is obviously critical. Mandamus does not provide adequate review. It is a prerogative writ discretionary in nature and does not guarantee a remedy. The earlier panel of this Court in this case denied review and declined to provide any relief against the prior restraint. It did not use mandamus to ensure a hearing on the order not to publish. Mandamus is a slender reed on which to hang one's hopes to reverse a wrong. It requires an obvious error in which officials or judges grossly exceed their authority, and it is a discretionary writ.

■ In contrast, permanent injunctions are immediately appealable. The permanent injunction against publication entered on October 3, 1995, fits in this category. The injunction still remains in effect even though another order was entered at the same time making copies of the document available to the public. This is our first experience with such a strange combination of orders. Why enter an injunction against publication of original documents and then allow publication of copies of the documents? Such orders serve no purpose other than to make a statement or declaration of wrongdoing while seeking to prevent review under the mootness doctrine. It is a clever strategem: Now you see it, now you don't. But appellate courts cannot allow themselves to be done out of their jurisdiction so cleverly. We would abdicate our responsibility of judicial review. So long as the permanent injunction remains technically in effect, we will review it as an injunction just as technically.

Review must be kept alive when a judge issues a prior restraint that he can cease when challenged and then take up again at a later time, only to cease again just in time to prevent appellate review. The doctrine of mootness is not to be used as a spoof on appellate courts. We therefore find that the case is not moot and proceed to consideration of the merits.

### B. Prior restraint

#### (1) The permanent injunction

■ It has long been established that a prior restraint comes to a court "with a heavy presumption against its constitutional validity." *Bantam Books v. Sullivan,* 372 U.S. 58, 70, 83 S.Ct. 631, 639, 9 L.Ed.2d 584 (1963). In this case, the news magazine *Business Week* obtained information from a confidential source and prepared a story on a matter of public concern. Following standard journalistic protocol, *Business Week* sought comment from the parties and proceeded to take the story to print. Instead, the magazine received a facsimile transmission from a Federal District Court prohibit-

ing publication of the information and citing "irreparable harm" as the reason. J.A. at 23.

██ The critical starting point for our analysis, therefore, is that we face the classic case of a prior restraint. Indeed, "[p]rohibiting the publication of a news story . . . is the essence of censorship," and is allowed only under exceptional circumstances. *Providence Journal*, 820 F.2d at 1345. Justice Blackmun recently summarized the state of prior restraint doctrine as follows:

> Although the prohibition against prior restraints is by no means absolute, the gagging of publication has been considered acceptable only in "exceptional cases." Even where questions of allegedly urgent national security, or competing constitutional interests, are concerned, we have imposed this "most extraordinary remedy" only where the evil that would result from the reportage is both great and certain and cannot be militated by less intrusive measures.

*CBS v. Davis*, —— U.S. ——, ——, 114 S.Ct. 912, 914, 127 L.Ed.2d 358 (1994) (Blackmun, J., in chambers) (citations omitted). Thus, we ask whether *Business Week*'s planned publication of these particular documents posed such a grave threat to a critical government interest or to a constitutional right as to justify the District Court's three injunctive orders.

Before proceeding to this constitutional inquiry, however, we must clear up the considerable confusion generated by the proceedings below. Not only did the District Court fail to conduct any First Amendment inquiry before granting the two TROs, but it compounded the harm by holding hearings on issues that bore no relation to the right of *Business Week* to disseminate the information in its possession. Weeks passed with the "gag order" in effect, while the court inquired painstakingly into how *Business Week* obtained the documents and whether or not its personnel had been aware that they were sealed. While these might be appropriate lines of inquiry for a contempt proceeding or a criminal prosecution, they are not appropriate bases for issuing a prior restraint.

Furthermore, when the District Court did finally identify the potential for a First Amendment problem, it dismissed the question with misplaced reliance on *Seattle Times v. Rhinehart*, 467 U.S. 20, 104 S.Ct. 2199, 81 L.Ed.2d 17 (1984). *Seattle Times* holds that *parties* to civil litigation do not have a right to disseminate information they have gained through participation in the discovery process. That case, however, does not govern the situation where an independent news agency, having gained access to sealed documents, decides to publish them.

In short, at no time—even to the point of entering a permanent injunction after two temporary restraining orders—did the District Court appear to realize that it was engaging in a practice that, under all but the most exceptional circumstances, violates the Constitution: preventing a news organization from publishing information in its possession on a matter of public concern.

We can only conclude that, had the District Court not been rushed to judgment by both parties and had it engaged in the proper constitutional inquiry, the injunction would never have been issued. Far from falling into that "single, extremely narrow class of cases" where publication would be so dangerous to fundamental government interests as to justify a prior restraint, *New York Times Co. v. United States*, 403 U.S. 713, 726, 91 S.Ct. 2140, 2147–48, 29 L.Ed.2d 822 (1971) (Brennan, J. concurring), the documents in question are standard litigation filings that have now been widely publicized. The private litigants' interest in protecting their vanity or their commercial self-interest simply does not qualify as grounds for imposing a prior restraint. It is not even grounds for keeping the information under seal, as the District Court ultimately and correctly decided. *Opinion and Order Granting Plaintiff's Motion for Leave to Amend its Complaint*, J.A. at 33. The permanent injunction, therefore, was patently invalid and should never have been entered.

### (2) The Temporary Restraining Orders

██ For the same reason, we find that the District Court erred in granting the two temporary restraining orders, but we recognize

an added layer of complexity with regard to this issue. The temporary orders raise the question of whether a district court, faced with an emergency petition to enjoin publication of certain information, may grant a TRO simply in order to give the problem due consideration. In other words, can the court preserve the status quo long enough to study the question without offending the First Amendment?

In answering this question, we are guided by the First Circuit's holding in *In the Matter of Providence Journal Company.* 820 F.2d 1342, *modified on reh'g* by 820 F.2d 1354 (1st Cir.1986), *cert. granted and dismissed on other grounds.* In *Providence Journal,* the district court had issued a temporary restraining order prohibiting a newspaper from publishing certain information in its possession and had scheduled a hearing for several days later. The First Circuit found that the TRO constituted a "transparently invalid prior restraint on pure speech." [2] *Id.* at 1344. The court recognized that the matter had come before the district court "on an emergency basis" and that "[t]he court was forced to drop its other duties and immediately address this issue." *Id.* at 1351. The court further noted that the "district court's natural instinct was to delay the matter temporarily so that a careful, thoughtful answer could be crafted." *Id.* The court concluded:

> This approach is proper in most instances, and indeed to follow any other course of action would often be irresponsible. But, absent the most compelling circumstances, when that approach results in a prior restraint on pure speech by the press it is not allowed.

*Id.*

The *Providence Journal* court's approach to the question reveals a fundamental difference between a standard TRO issued under Rule 65 of the Federal Rules of Civil Procedure in a non-speech context and a special injunctive order granting a prior restraint.

Although we may refer to the latter as a TRO, it is a different beast in the First Amendment context.

 First, as the *Providence Journal* court noted, the purpose of a TRO under Rule 65 is to preserve the status quo so that a reasoned resolution of a dispute may be had. Where the freedom of the press is concerned, however, the status quo is to "publish news promptly that editors decide to publish. A restraining order disturbs the status quo and impinges on the exercise of editorial discretion." *Providence Journal,* 820 F.2d at 1351. Rather than having no effect, "a prior restraint, by ... definition, has an immediate and irreversible sanction." *In re King World Productions,* 898 F.2d 56, 60 (6th Cir.1990) (quoting *Nebraska Press,* 427 U.S. at 559, 96 S.Ct. at 2802–03).

 Second, while a TRO may be granted *ex parte* under certain circumstances laid out in Rule 65, those circumstances are severely limited in the First Amendment context. While "[t]here is a place for *ex parte* issuance, without notice, of temporary restraining orders of short duration," there is no place for such orders in the First Amendment realm "where no showing is made that it is impossible to serve or to notify the opposing parties and give them an opportunity to participate." *Carroll,* 393 U.S. at 180, 89 S.Ct. at 351. *See Providence Journal,* 820 F.2d at 1351 (a prior restraint "issued prior to a full and fair hearing ... faces an even heavier presumption of invalidity."). In addition to guaranteeing the due process rights of the third-party news organization, giving notice and a hearing increases the likelihood that any impingement on First Amendment rights that might follow will be well-founded.

 Third, the inquiry that the court must conduct is different. In issuing a TRO, a district court is to review factors such as the party's likelihood of success on the merits and the threat of irreparable injury. *Mason County Medical Ass'n v. Knebel,* 563 F.2d 256, 261 (6th Cir.1977). In the case of a

---

**2.** The court addressed the TRO issue in the context of reversing the newspaper's conviction for criminal contempt. (The newspaper had violated the TRO the day after it was entered.) The First Circuit held that, for the purpose of criminal contempt charges, a newspaper was permitted to challenge such a "transparently invalid" prior restraint by violating it. *Providence Journal,* 820 F.2d at 1344.

prior restraint on pure speech, the hurdle is substantially higher: publication must threaten an interest more fundamental than the First Amendment itself. Indeed, the Supreme Court has never upheld a prior restraint, even faced with the competing interest of national security or the Sixth Amendment right to a fair trial.

For similar reasons, the standard of review is different. The decision to grant or deny an injunction is reviewed for abuse of discretion. *Id.* We review First Amendment questions de novo.[3] *Bose Corp. v. Consumers Union of United States,* 466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984).

Thus, the prerequisites for emergency, temporary injunctive relief in the First Amendment realm differ dramatically, and appropriately, from the realm of everyday resolution of civil disputes governed by the Federal Rules. And while compliance with the former is required, mere compliance with the latter might have averted the protracted damage to the First Amendment that occurred in this case. Unfortunately, neither were met here. Neither the parties nor the District Court attempted to contact McGraw–Hill before the order was transmitted. The court did not even "define the injury and state why it is irreparable and why the order was granted without notice" as it would be required to do under Rule 65.

### C. The Protective Order

Finally, the underlying protective order signed by Judge Rubin bears comment. While District Courts have the discretion to issue protective orders, that discretion is limited by the careful dictates of Fed. R.Civ.P. 26 and "is circumscribed by a long-established legal tradition" which values public access to court proceedings. *Brown & Williamson Tobacco Corp. v. FTC,* 710 F.2d 1165, 1177 (6th Cir.1983), *cert. denied,* 465 U.S. 1100, 104 S.Ct. 1595, 80 L.Ed.2d 127 (1984). Rule 26(c) allows the sealing of court

papers only "for good cause shown" to the court that the particular documents justify court-imposed secrecy. In this case, the parties were allowed to adjudicate their own case based upon their own self-interest. This is a violation not only of Rule 26(c) but of the principles so painstakingly discussed in *Brown & Williamson.*

The District Court cannot abdicate its responsibility to oversee the discovery process and to determine whether filings should be made available to the public. It certainly should not turn this function over to the parties, as it did here, allowing them to modify the terms of a court order without even seeking the consent of the court. The protective order in this case allows the parties to control public access to court papers, and it should be vacated or substantially changed.

### III. Conclusion

For the foregoing reasons, we REVERSE and VACATE the challenged orders.

BOYCE F. MARTIN, Jr., Circuit Judge, concurring.

While I concur in Chief Judge Merritt's opinion, I write separately to express my views on a few issues. With regard to whether this case was barred by the mootness doctrine, I note that it regrettably fell to my lot to choose between the two very logical and well-reasoned views of Chief Judge Merritt and Judge Brown on the issue. After careful consideration, I agree that this case continued to present a live controversy enabling our review of its merits. Despite the fact that, on October 3, 1995, the district court unsealed the documents at issue, it entered a second order that same day permanently enjoining *Business Week* from publishing the confidential materials it ob-

---

**3.** A final difference, at least in this case, is the source of judicial authority for the order. Here, the party subject to the injunction was not already before the court. Rule 65 explicitly states that it "is binding only upon the parties to the action, their officers, agents, servants, employees, attorneys, and upon those persons in active concert or participation with them." In this case, the District Court's authority came, presumably, from the All Writs Act, which gives the court power to "issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C § 1651.

tained unlawfully. Because that injunction is a permanent one, it is a final and appealable order. Moreover, because I believe it is an unlawful prior restraint that remains in effect, the present case was not rendered moot, and we properly could reach the merits of the claim presented.

I note more generally that this appeal is the culmination of a series of missteps at every stage of the case. To begin with, Bankers Trust and Procter & Gamble never should have been allowed, in January 1995, to stipulate to a broad protective order as part of their discovery process. By its terms, the protective order could be amended by the parties without prior court approval and would be effective against non-parties. This is ludicrous. In allowing the parties to stipulate to a protective order, the district court abdicated its responsibility for supervising the discovery proceedings.

The district court's initial order of September 13, 1995, that was faxed to McGraw–Hill prohibiting publication, was equally problematic. The district court had absolutely no jurisdiction over *Business Week* at that time, and the magazine did not receive notice or a hearing prior to the court's enjoining it from publishing the documents at issue. Any court order, to be valid, needs jurisdiction, and the lack of it in this case essentially subjected *Business Week* to the modern day equivalent of a star chamber.

After McGraw–Hill filed for a stay of the district court order and an expedited appeal with this Court the following day, a panel dismissed the appeal on the ground that the order was only temporary and therefore not final and appealable. At that stage, the nature of the appeal should have been converted to a mandamus action under *In re King World Productions, Inc.,* 898 F.2d 56 (6th Cir.1990), and the panel set aside the prior restraint.

Finally, on October 3, the district court filed its two contradictory orders, simultaneously entering a permanent injunction against publication of the confidential materials *Business Week* obtained unlawfully and releasing the sealed documents into the public domain. In entering the permanent injunction, I do not believe the district court even came close to justifying its action in light of Justice Stewart's statement that a prior restraint upon publication is improper absent proof that publication "will surely.result in direct, immediate, and irreparable damage to our Nation or its people." *New York Times Co. v. United States,* 403 U.S. 713, 730, 91 S.Ct. 2140, 2149, 29 L.Ed.2d 822 (1971). It is thus clear to me that the permanent injunction that remains in effect is a prior restraint that logically falls within that group of cases capable of repetition yet evading review. I therefore join Chief Judge Merritt in holding that the injunction violates the First Amendment and must be set aside.

I note as well that this appeal is a stark example of the ways in which financial and economic powers drive our society. *Business Week* is certainly a respected financial publication, but I would not hold it out as the torch-bearer for freedom of the press in light of the fact that this case dealt more with economic power than with the effect of a free and unfettered press on our society. Having read the entire record in this case, I am at a loss as to why *Business Week* felt this information was so newsworthy. Ironically, the district judge's faxed order of prior restraint engendered more media coverage than the original information passed along by an unthinking lawyer. This is an example to me of highly-paid counsel wanting to try a case in the media, which unfortunately does nothing for the judiciary's poor public relations as a whole. This case should serve as a reminder that the First Amendment cuts both ways. It protects the speech here from prior restraint, but the media has an ethical duty to report fairly and without distortion. Moreover, the media ought to refrain from blaming the judiciary when a situation like this, caused in large part by the parties' conduct, arises.

Finally, what causes the greatest concern in my mind is that a reading of our decision in this case could be an additional chapter in Philip K. Howard's book, *The Death of Common Sense: How Law is Suffocating America.* (Random House, New York, 1994).

BAILEY BROWN, Circuit Judge, dissenting.

While I have no quarrel with the majority's analysis of the law generally prohibiting prior restraints, I must respectfully dissent because I would hold this case effectively moot, and thus I would not reach the First Amendment issue.[1] *Business Week* has its documents, and it has published its story. Indeed, the magazine has long since printed excerpts from the once-sealed material on its cover. Moreover, I do not believe the case presents issues that are "capable of repetition, yet evading review."

### A. Factual Background

Two American corporate giants, Procter & Gamble (P & G) and Bankers Trust (BT), are involved in high-stakes, high-profile litigation about the sale of derivatives, which are a particularly newsworthy investment these days. As part of this litigation, plaintiff P & G sought documents from defendant BT about its derivatives sales practices, and BT eventually parted with those documents.[2] BT did so, however, under seal, pursuant to an existing court order entered by Judge Rubin. Although aware of that order, *Business Week* reporters managed to get the documents, and the magazine was about to print a story concerning their contents as part of its ongoing coverage of the lawsuit. The district court, at the urging of both P & G and BT, faxed what amounted to a temporary restraining order to *Business Week*, forbidding the publishing of the story about the documents.

Rather than present its prior restraint case to the district judge, *Business Week* initially, and unsuccessfully, sought relief from one judge of this court, then from another panel of this court, and then from our Circuit Justice on the Supreme Court. While before the prior panel of this court, the magazine did not petition for a writ of mandamus. Rather, it sought a stay of the order and an expedited appeal. *Joint Appendix* at 55–56. The prior panel viewed the matter as an appeal of a temporary restraining order, and thus dismissed the appeal for lack of jurisdiction. *Id.* Circuit Justice Stevens denied the magazine's application for an emergency stay of that order, and recommended that the parties return to the district court. *McGraw–Hill Cos. v. Procter & Gamble Co.*, — U.S. ——, —— – ——, 116 S.Ct. 6, 6–7, 132 L.Ed.2d 892 (Stevens, Circuit Justice 1995).

The parties returned to the district court the very day Justice Stevens handed down his opinion. After holding a two-day hearing on the matter, the district court extended its original restraining order for ten days while it held more hearings. Eventually, on October 3, 1995, the district court simultaneously issued two orders. One order permanently enjoined *Business Week* from publishing the documents which its reporters had obtained. The second order, however, rendered the first a virtual nullity, because it concurrently unsealed the filed documents, thereby enabling *Business Week* to publish its story. As previously noted, the magazine has done so.[3]

---

**1.** I also agree that, under the holding of Judge Merritt's opinion in *Brown & Williamson Tobacco Corp. v. FTC*, 710 F.2d 1165, 1177 (6th Cir. 1983), *cert. denied*, 465 U.S. 1100, 104 S.Ct. 1595, 80 L.Ed.2d 127 (1984), the late Judge Rubin abused his discretion by allowing the parties to determine whether particular documents merited seal under Federal Rule of Civil Procedure 26(c); however, I point out that no one in this case has complained about this procedure.

While Rule 26(c) does require that a motion be made for a protective order to issue, it is common practice for parties to stipulate to such orders. "Good cause" must, however, still be shown for the court to issue a stipulated order. *See* Patrick S. Kim, Note, *Third Party Modification of Protective Orders Under Rule 26(c)*, 94 Mich.L.Rev. 854, 854 n. 4 (1995) (citing Arthur

R. Miller, *Confidentiality, Protective Orders, and Public Access to the Courts*, 105 Harv.L.Rev. 427 (1991) and *Jepson, Inc. v. Makita Elec. Works*, 30 F.3d 854, 858 (7th Cir.1994)).

**2.** This panel dealt with another discovery dispute in this litigation last year. *In re Bankers Trust Co.*, 61 F.3d 465 (6th Cir.1995) (Brown, J.) (holding, *inter alia*, that documents prepared by BT and the Federal Reserve during an investigation of BT were subject to discovery).

**3.** We also note that the magazine has reaped substantial publicity (and new prominence as a First Amendment champion) from the entire affair. *E.g.*, James Traub, *The Press v. the Courts*, The New Yorker, Dec. 4, 1995, at 35.

## B. Mootness

A case is moot when no live controversy remains, and no live controversy remains when a court cannot provide effective relief. *See, e.g., Deakins v. Monaghan,* 484 U.S. 193, 199, 108 S.Ct. 523, 527–28, 98 L.Ed.2d 529 (1988). Mootness is a matter of subject matter jurisdiction with its roots in the Constitution, which limits our jurisdiction to "Cases" and "Controversies." U.S. Const. art. III, § 2. This case elegantly demonstrates why the framers so limited our jurisdiction.

Given the district court's unsealing of the documents at issue, we cannot provide any effective relief; thus, no live controversy remains. *Business Week* has received the relief it wanted, albeit not in the manner it expected. At this point, we need only provide the established two-part remedy for moot cases: (1) vacate, as moot, the district court's order permanently enjoining *Business Week*'s publication of the documents it obtained, and (2) remand with instructions to dismiss the case. *Deakins,* 484 U.S. at 200, 108 S.Ct. at 528–29; *WJW–TV, Inc. v. City of Cleveland,* 878 F.2d 906, 911–12 (6th Cir.) (per curiam), *cert. denied,* 493 U.S. 819, 110 S.Ct. 74, 107 L.Ed.2d 41 (1989).

The majority, however, would review this case for two reasons. First, the majority determines that the propriety of issuing the temporary restraining orders falls within the mootness doctrine exception for matters "capable of repetition, yet evading review." *E.g., Southern Pac. Terminal Co. v. Interstate Commerce Comm'n,* 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911). Second, as the majority notes, the permanent injunction issued by the district court with respect to the copies of the documents obtained by *Business Week* technically remains in effect. Thus, the majority contends, the question of whether the district court erred in issuing the injunction is not moot. I disagree on both points.

## 1. The temporary restraining orders.

As the *Southern Pacific Terminal Co.* case demonstrates, courts created the "capable of repetition, yet evading review" exception to the mootness doctrine "because of the necessity or propriety of deciding some question of law presented which might serve to guide [a decision-maker] when again called upon to act in the matter." *Id.* at 516, 31 S.Ct. at 284 (quoting *Boise City Irr. & Land Co. v. Clark,* 131 F. 415, 419 (9th Cir.1904)). This exception has since evolved into a pair of particularized inquiries, and only if we have affirmative answers to *both* questions may we apply the exception. *Weinstein v. Bradford,* 423 U.S. 147, 149, 96 S.Ct. 347, 348–49, 46 L.Ed.2d 350 (1975) (per curiam). First, we ask whether there is a "reasonable expectation" or a "demonstrable probability" that the *same* complaining party will confront this *same situation* again. *Murphy v. Hunt,* 455 U.S. 478, 482, 102 S.Ct. 1181, 1184, 71 L.Ed.2d 353 (1982) (per curiam); *Weinstein,* 423 U.S. at 149, 96 S.Ct. at 349. If the answer is yes, we have a situation "capable of repetition." Second, we ask whether the lifespan of the particular debate has a predetermined limit, such that it could *never* be fully litigated before its cessation. *Murphy,* 455 U.S. at 482, 102 S.Ct. at 1183–84; *Weinstein,* 423 U.S. at 149, 96 S.Ct. at 348–49. If it does, we have a situation "evading review."

Assuming, without deciding, that what happened in this case is capable of repetition,[4] I do not believe that it will evade review. First, if a district court confronted a similar situation and issued similar orders to *Business Week* again, I believe that the district court would (as the court was prepared to do in this case) review the matter immediately. *See Nebraska Press Ass'n v. Stuart,* 427 U.S. 539, 559, 96 S.Ct. 2791, 2802–03, 49 L.Ed.2d 683 (1976) (stating that even minimal interference with First Amendment freedoms is an irreparable injury). That sort of immediate review would almost certainly have happened here, had *Business Week* chosen to make its application in the district court before it moved up the appel-

4. I believe that it is a close question whether *Business Week* can reasonably expect, with a demonstrable probability, to receive an *ex parte* order from a district judge forbidding it from publishing sealed discovery materials that it may obtain in the future.

late ladder. Instead of seeking an immediate hearing before the district judge on the temporary order (and the order's prompt dissolution), however, *Business Week* chose to come to one judge, and then a panel, of this court, and then it appealed to our Circuit Justice.[5] Only then did it return to the district court, where the hearings were held.

Second, and more importantly, if *Business Week* finds itself in this situation again and again chooses to seek immediate appellate review, the matter would not evade review, even given the short life of temporary orders. This is so because an established body of Sixth Circuit precedent provides for prompt review of—and, almost certainly, relief from—such orders with a petition for a writ of mandamus. *Business Week*, however, framed its emergency appeal simply as a request for a stay of the district court's order and a request for an expedited appeal. Had *Business Week* presented a petition for a writ of mandamus, we could have turned to that body of law and rapidly dealt with the prior restraint question.

The pellucid opinion in *In re King World Productions*, 898 F.2d 56 (6th Cir.1990) (Martin, J.), is precisely on point. *King World* involved a temporary restraining order which enjoined the television broadcast of footage which, according to the plaintiff, was obtained in violation of federal and state law. This court entertained a petition for a writ of mandamus only eight days after the district court entered its order, and this court issued its opinion within three days after that hearing. We stated that "mandamus is the only vehicle for obtaining appellate review of an improperly issued temporary restraining order when the first amendment runs afoul of a conflicting right and prior restraint may result." *King World*, 898 F.2d at 59. We proceeded to issue the writ because the plaintiff below in that case could not show that he would "suffer an irreparable harm great enough to justify a prior restraint." *Id.* at 60.

The majority argues that mandamus is an inadequate vehicle for review of prior restraints because "[i]t requires an obvious error in which officials or judges grossly exceed their authority, and it is a discretionary writ." *Majority Op.* at 224. While the majority recites the correct standard for determining when this court should use its discretion to issue a writ of mandamus, it errs in its implicit determination that the situation presented by this case (or any other alleged prior restraint by a district judge) might not warrant review and remediation through a writ of mandamus. In. *King World*, this court painstakingly considered facts strikingly similar to those in this case within the framework for determining whether a writ of mandamus should issue, and we concluded that it should. *King World*, 898 F.2d at 58–59.

In fact, for the reasons ably set forth in the substantive portion of the majority opinion, I cannot imagine a case more appropriate for mandamus review than this one. Thus, I find most curious the majority's statement that "important issues raised by the unusual circumstances of a prior restraint, including the time and manner in which a court must address a TRO petition, would always evade review absent this exception to mootness." *Majority Op.* at 224. This court has already addressed such prior restraints issued by district courts and struck them down as such. *King World*, 898 F.2d at 60; *see also United States v. Ford*, 830 F.2d 596, 598–600 (6th Cir.1987) (Merritt, J.) (holding that a broad, interlocutory "gag" order in a mail and bank fraud case involving a congressman which prohibited the congressman from discussing his case, even with other members of Congress or on the floor of the House of Representatives was (1) "appealable as [a 28 U.S.C.] § 1291 final order[ ] under the 'collateral order' doctrine ... as well as in mandamus," and (2) an impermissible prior restraint); *CBS Inc. v. Young*, 522 F.2d 234, 237 (6th Cir.1975) (per curiam) (holding that mandamus permitted appellate review of a district court order restraining public comment by the parties, as well as

---

5. There appears to be some dispute about the effort *Business Week* made to contact the district court after the magazine received the initial temporary order. The district judge states in one of his orders that he was not contacted at all, despite his being "always available to provide a full hearing." *J.A.* at 37. *Business Week* claims that it attempted to contact the judge, but failed. *Br. of Appellant The McGraw–Hill Companies, Inc.* at 10.

their friends and relatives, in the civil litigation arising from the tragic shootings at Kent State University).

These important cases evidently eluded *Business Week*, for under the clear holdings of these cases, *Business Week* could have obtained prompt review of its contention that the district court's order was an unconstitutional prior restraint. Attorneys should be aware that these cases are available authority for obtaining proper and prompt review of the propriety of any future prior restraints similar to the one in the instant case. Thus, if a situation such as the one before us arises again in this circuit, it most certainly would not evade review, because the harmed party could immediately petition for a writ of mandamus.

### 2. The permanent injunction.

As for the permanent injunction, the mere fact that it is "technically" still in effect does not create a basis for review of this case. To hold otherwise, as the majority does, shakes the mootness doctrine to its very foundations. Every time an appellate court holds that a case has become moot after the lower court disposed of it, some judgment or order of the lower court "remains technically in effect," as the majority states. *Majority Op.* at 224. The appropriate question is, can we provide effective relief given the case before us? *Deakins,* 484 U.S. at 199–200, 108 S.Ct. at 527–29. In this case, we cannot. As previously explained, *Business Week* has already published excerpts from the documents affected by the injunction. Presumably, it could bind the documents into a special edition and publish them in their entirety, if it so chose.

Moreover, this "technical" argument completely ignores our established procedure for handling moot cases: we vacate the order or judgment at issue and remand with directions to dismiss the case. *E.g., Deakins,* 484 U.S. at 200, 108 S.Ct. at 528–29. In fact, what appears to disturb the majority, *Business Week,* and the many *amici* who have filed briefs is an unrealistic fear that some-

one, someday, could employ the text of the district court's mooted permanent injunction to delay someone else's publication of sealed court documents—especially since, as the majority notes, litigants routinely seek protective orders.[6] Thus, *Business Week* and the friends of the court want us to hold that this case either is not moot at all, or is "capable of repetition, yet evading review."

What the majority, *Business Week,* and the *amici* fail to grasp, however, is that the mootness doctrine gives them the remedy they want, albeit without the visceral satisfaction of a First Amendment casebook entry. We would prevent any damage that the continued existence of the permanent injunction could cause by vacating it and remanding the case with directions to dismiss. Such action, as the Supreme Court put it, "strips" the mooted orders of any precedential value. *Deakins,* 484 U.S. at 200, 108 S.Ct. at 528; *see also, e.g., WJW–TV, Inc.,* 878 F.2d at 911–12. Thus, the concerns of the majority, *Business Week,* and the *amici* are not well founded.

For the foregoing reasons, I respectfully dissent.

---

**6.** The majority also expresses its concern that the district court simultaneously issued its permanent injunction and the order mooting it in a clever attempt to deprive this court of jurisdiction to review its actions. I do not believe this was the intent of the district court. Even if this was the court's intent, however, it does not change the fact that this case, as presented to us, is moot.