REL: 10/17/2014

Notice: This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0649), of any typographical or other errors, in order that corrections may be made before the opinion is printed in **Southern Reporter**.

# SUPREME COURT OF ALABAMA

OCTOBER TERM, 2014-2015

_____

1130537

_____

**Ex parte Jeffrey Wright**

**PETITION FOR WRIT OF MANDAMUS**

(In re: Jeffrey Wright

v.

A-1 Exterminating Company, Inc., et al.)

(Etowah Circuit Court, CV-12-900782)

## 1130538

Ex parte Myron K. Allenstein et al.

PETITION FOR WRIT OF MANDAMUS

(In re:  Myron K. Allenstein et al.

v.

A-1 Exterminating Company, Inc., et al.)

(Etowah Circuit Court, CV-12-900784)

WISE, Justice.

The petitioners, the plaintiffs in two separate cases below, filed petitions for a writ of mandamus requesting that this Court direct the trial court to rescind its January 7, 2014, protective order and its January 22, 2014, order compelling immediate compliance with that protective order. They then filed amended petitions requesting that this Court direct the trial court to rescind its February 21, 2014, and February 27, 2014, amended protective orders.  We grant the petitions and issue the writs.

Factual Background and Procedural History

1130537 and 1130538

On December 14, 2012, Jeffrey Wright and Myron K. Allenstein filed separate complaints against A-1 Exterminating Company, Inc. ("A-1 Exterminating"); Terry Buchanan; Edward Wrenn; and David Wrenn (hereinafter collectively referred to as "A-1").[1]  In the complaints, the plaintiffs alleged that, on the date of the initial termite bonds issued to the plaintiffs, A-1 Exterminating entered into agreements with the plaintiffs in which it agreed to identify and recommend the appropriate services to protect the plaintiffs' houses or property from termites; that the plaintiffs had paid for the initial service, the issuance of the termite bond, and annual renewal premiums; that, during subsequent periodic visits to the subject properties, A-1 sprayed liquids and either represented to the plaintiffs or led the plaintiffs to believe that those applications were treatments for termites; that, during the last two years, A-1 had admitted that the periodic sprays were not to prevent or control termites; and that Buchanan, a State-licensed pest-control operator who worked for A-1 Exterminating, had admitted that the spray was a

_____

[1]A-1 Insulating Company and Wrenn Enterprises, Inc., were also named as defendants.  However, they were not named in the motions and orders that are relevant to this case.

3

regular, watered-down pesticide that might only be strong enough to kill ants and possibly spiders. The plaintiffs also alleged that A-1 had led them to believe that, after a proper and adequate periodic inspections, the subject properties were free and clear of active or previous infestations of wood-destroying organisms, including termites; that A-1 had led them to believe that the properties had been treated to prevent termite infestation and damage; and that no initial termite treatment had been applied at the subject properties and that A-1 had never applied a termite treatment at the properties. The plaintiffs further alleged that, to the extent any house had actually received a partial "vaccination" for termites, the chemical had worn off and no effective barrier had been placed between the house and the soil either initially or after the partial "vaccination" had occurred and that that fact was concealed from the plaintiffs. Finally, the plaintiffs alleged:

> "Because Plaintiff's HOME did not receive a vaccination and due to the prevalence of termites in central Alabama, hidden infestations are the presumed consequence and the ongoing and continuous latent damage that termites will cause as the result had resulted in an ongoing and continuous injury to the HOME from the date of the initial service to present which has been compounded by [A-1] skipping

4

> thorough, professional, and required annual inspections to detect and stop infestation and damage and instead focus on the useless and deceptive sprays to induce renewal payments."

The two complaints included counts alleging fraud, including promissory fraud; breach of warranty; negligence, including negligence per se, and wantonness; breach of contract; and negligent training, supervision, and retention.  It also included a request for "equitable relief, including unjust enrichment."

Wright's case, case no. CV-12-900782, and Allenstein's case, case no. CV-12-900784, were assigned to different judges.  Later in the day on December 14, 2012, the day the complaints were filed, Wright filed a first amended complaint in case no. CV-12-900782 that included class-action allegations.  Also, on that same day, Allenstein filed a "First Amended Mass Action Complaint" in case no. CV-12-900784, and that amended complaint named as plaintiffs Allenstein and numerous other persons, including Wright. Subsequently, the trial court entered an order consolidating the two cases.

1130537 and 1130538

On March 5, 2013, A-1 filed motions for protective orders in both cases. In those motions, A-1 requested that the trial court enter

> "a protective order or otherwise to bar and enjoin Plaintiffs and Plaintiffs' counsel from extrajudicial references to the circumstances of the above-styled case, to require Plaintiffs' counsel to remove all mention of the above-styled case and the surrounding circumstances of the above-styled case from its website, Facebook page, social media (including electronic social media), and related web search engines; and otherwise refrain from referencing this case and/or its surrounding circumstances outside of court."

In the motions for a protective order, A-1 asserted:

> "1. A-1 has learned that Plaintiff's [sic] attorneys have prominently featured the subject-matter of this case (A-1's annual sprays at customer's houses) on that law firm's web site ... The Plaintiff's [sic] attorney's version of this case is defamatory, contains egregious errors of fact, uses sensationalistic and inflammatory terms, and is plainly written to influence prospective jurors in this case and attract clients for the Plaintiffs' law firm. The extrajudicial references to the above-styled case on Plaintiff's [sic] attorney's website violates Alabama Rules of Professional Conduct 3.6 and 4.1.
>
> "2. The Plaintiffs' attorney's skewed vision of events in this case claims that A-l's annual sprays are a 'fraud,' that A-l's customer letters concerning the annual spays 'is actually another fraud,' that A-l has never performed a proper termite prevention treatment at its customers' houses, and that A-l's customers have the choice of suing now 'or let A-l Exterminating and its owners

6

get away with a fraud that has drained East Alabama of tens of millions of dollars over the years.' (Exhibit 1, web page from Plaintiffs' law firm's web site).

"3. Apart from the obvious untruths, the web site is transparently intended to influence prospective jurors. The web site is inflammatory and will taint any prospective venire. The web site is clearly designed with the dual intent of tainting prospective jurors and attracting additional clients for the Plaintiffs' law firm.

"....

"7. In addition, a Google search of 'A-l Exterminating' shows that the link to file aforementioned Plaintiffs' attorney's web site is the fifth entry on Google. (Exhibit 5, Google web page). A Google search of 'A-l Exterminating lawsuit' (the search term appears, without prompting, on a dropdown menu) shows that three of the first five entries are links to web sites or Facebook pages operated by the Plaintiffs' attorney's law firm. Because Google places links according to paid revenue, it appears that Plaintiffs' attorneys may have paid consideration to Google to place this information in a prime place on Google."

A-1 argued that the Web sites were highly prejudicial to it; that there was "no justifiable reason for the extrajudicial references to the above-styled case on the web site reference above, except to attract clients for the Plaintiffs' law firm and/or to prejudice potential jurors"; and that "A-1's

business reputation and operations are being damaged by the Plaintiffs' attorney's pretrial tactics."

The plaintiffs filed oppositions to A-1's motions for a protective order. In their oppositions, the plaintiffs argued that the motions for a protective order were an attempt to restrict the free-speech rights of the plaintiffs and their attorneys; that the stories included on the law firm's Web site and in social media "comment upon the evidence concerning public trials where [plaintiffs' attorney's law firm] represented the Plaintiff in a case with identical claims"; that the complaints and amended complaints in this case are public records and include detailed statements of the allegations; and that "the facts are contained within dozens of public complaint files concerning A-1 Exterminating, Co., Inc. or its owners and licensees that are on file with the Alabama Department of Agriculture and Industries ('ADAI') which regulate[s] this business and the individual defendants." The plaintiffs also disputed A-1's allegations regarding how the Google search engine worked.

A-1 subsequently filed three supplements to its motions for a protective order and included additional exhibits and

arguments in support of the motions. In the second supplemental motion for a protective order, A-1 asserted:

> "On November 4, 2013, Birmingham television station WBRC-TV 6 aired a 'sting operation'[1] which purported to show that A-1 performed deficient termite inspections at its customers houses. This 'sting operation' clearly was prepared with Plaintiffs' counsel's collaboration, if not outright instigation.
>
> "_____
>
> "[1]The term 'sting operation' comes from the Plaintiffs' attorney."

A-1 went on to assert that the "sting operation" was objectionable on several grounds; that the "sting operation" contained "flagrantly erroneous information"; that the "sting operation" had damaged its business operations and business reputation; and that the "sting operation" had "poisoned the jury venire in Etowah County and has prejudiced A-1's right to a fair trial in this case."

On January 7, 2014, the trial court entered the following protective order, which carried the styles of both cases:

> "This matter came on to be heard on [A-1's] March 5, 2013 Motion for Protective Order. The Court has considered that Motion, [A-1's] Supplement of September 16, 2013, Plaintiffs' September 16, 2013 Reply, [A-1's] Second Supplement filed November 11, 2013, [A-1's] Third Supplement and the arguments

of counsel, the Court finds that the Motion is due to be GRANTED.

"Accordingly, it is hereby ORDERED, ADJUDGED AND DECREED that the Motion for Protective Order is GRANTED. The Plaintiffs and Plaintiffs' counsel are hereby barred and enjoined from extrajudicial references to the circumstances of the above styled cases. Plaintiffs' counsel shall remove all mention of the above styled cases and the surrounding circumstances of the above styled case from its website, Facebook page, social media (including electronic social media), and related web search engines. Plaintiffs and Plaintiffs' counsel are otherwise ordered to refrain from referencing this case and/or its surrounding circumstances outside of court."

(Capitalization in original.)

On January 13, 2014, A-1 filed a motion seeking to have the plaintiffs immediately comply with the trial court's January 7, 2014, protective order. On January 22, 2014, the trial court entered an order granting that motion. On January 24, 2014, the plaintiffs filed a "Notice of Compliance with Gag Order." On January 31, 2014, the plaintiffs filed a motion to vacate, alter, or amend the trial court's January 7, 2014, protective order. They also filed a motion to stay the protective order pending a ruling on the motion to vacate, alter, or amend.

10

On February 5, 2014, the plaintiffs filed an "Emergency Motion for Hearing on Motion for Stay, Motion to Vacate, Alter or Amend, and Motion for Disclosure of Ex parte Communications." On that same date, A-1 filed a motion to amend the protective order entered on January 7, 2014.

On February 18, 2014, the plaintiffs filed their petitions for a writ of mandamus in this Court.

On February 21, 2014, the trial court entered the following amended protective order in case no. CV-12-900784:

> "This matter came on to be heard on Defendants, A-1 Exterminating Company, Inc.'s, Edward Wrenn's, David Wrenn's, and Terry Buchanan's March 5, 2013 motion for protective order. Having considered that Motion, Defendants' supplement of September 16, 2013, Plaintiffs' September 16, 2013 reply, Defendants' second supplement filed November 11, 2013, and Defendants' third supplement. Having considered the Motion and the arguments of counsel, the Court finds that the Motion is due to be GRANTED.
>
> "Accordingly, it is hereby ORDERED, ADJUDGED, and DECREED that the motion for protective order is GRANTED. The Plaintiffs and Plaintiffs' counsel are hereby barred and enjoined from extrajudicial references to the circumstances of the above-styled case, Plaintiffs' counsel and his firm shall remove all mention of the above-styled case and the surrounding circumstances of the above-styled case from the firm's website and from the firm's and/or his individual Facebook page, Linkedin Page, and all social media (including electronic social media), and related web search engines. Plaintiffs and

Plaintiffs' counsel are otherwise ordered to refrain from referencing this case and/or its surrounding circumstances outside of court.

"Nothing in this order shall prevent any attorney, law firm, and/or that law firm's staff from discussing this case with their respective clients, internally with persons working at any such law firm, with other attorneys involved in this case, including those attorneys' staff, and/or with any expert witnesses."

(Capitalization in original.)

On February 27, 2014, the trial court entered an amended protective order in case no. CV-12-900782 that was virtually identical to the amended protective order entered in case no. CV-12-900784.

On March 3, 2014, the plaintiffs filed amended petitions for a writ of mandamus in this Court seeking a rescission of the February 21 and February 27 amended protective orders.

### Standard of Review

"This Court stated in Ex parte Pfizer, Inc., 746 So. 2d 960 (Ala. 1999):

"'The writ of mandamus is an extraordinary remedy, and one petitioning for that writ must show "(1) a clear legal right in the petitioner to the order sought; (2) an imperative duty on the respondent to perform, accompanied by a refusal to do so; (3) the lack of another adequate remedy; and (4) properly invoked jurisdiction of the court." Ex parte

12

1130537 and 1130538

> > *Alfab, Inc.*, 586 So. 2d 889, 890 (Ala.
> > 1991); see also, *Martin v. Loeb & Co.*, 349
> > So. 2d 9 (Ala. 1977); *Ex parte Slade*, 382
> > So. 2d 1127 (Ala. 1980) [overruled on other
> > grounds by *Ex parte Creel*, 719 So. 2d 783
> > (Ala. 1998)]; *Ex parte Houston County*, 435
> > So. 2d 1268 (Ala. 1983); *Ex parte Johnson*,
> > 638 So. 2d 772 (Ala. 1994). "Mandamus is
> > an extraordinary remedy and will lie to
> > compel the exercise of discretion, but not
> > to compel its exercise in a particular
> > manner except where there is an abuse of
> > discretion." *State v. Cannon*, 369 So. 2d
> > 32, 33 (Ala. 1979).'
>
> "746 So. 2d at 962."

*Ex parte Anderson*, 789 So. 2d 190, 193-94 (Ala. 2000).

## Discussion

The petitioners argue that the trial court's protective order and amended protective orders constitute impermissible prior restraints on speech, in violation of the First Amendment, and that they are unconstitutionally overbroad. Specifically, they contend:

> "Prior restraints are forbidden by the First
> Amendment except in the most extreme circumstances.
> *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559
> (1976). A prior restraint on pure speech can be
> justified only if the speech to be forbidden
> threatens a constitutional value even more precious
> than the First Amendment. *Procter & Gamble Co. v.
> Bankers Trust Co.*, 78 F. 3d 219, 227 (6th Cir.
> 1996). Such countervailing values as national
> security interests, *New York Times Co. v. United
> States*, 403 U.S. 713, 714 (1971), or the protection

13

of reputation, <u>Organization for a Better Austin v. Keefe</u>, 402 U.S. 415, 418 (1971), or the protection of litigation against public pressure, <u>U.S. v. Columbia Broadcasting System</u>, 497 F.2d 102 (5th Cir. 1974), or the need for orderly processing of class actions, <u>Bernard v. Gulf Oil Co.</u>, 619 F.2d 459 (5th Cir. 1980) (<u>en banc</u>), have all been held to be insufficient justification for prior restraints."

Initially, we note that Rule 3.6, Ala. R. Prof. Conduct, governs extrajudicial statements by attorneys. Rule 3.6 provides, in pertinent part:

"(a) A lawyer shall not make an extrajudicial statement that a reasonable person would expect to be disseminated by means of public communication <u>if the lawyer knows or reasonably should know that it will have a substantial likelihood of materially prejudicing an adjudicative proceeding</u>.

"(b) A statement referred to in paragraph (a) ordinarily is likely to have such an effect when it refers to a civil matter triable to a jury, a criminal matter, or any other proceeding that could result in incarceration, and the statement relates to:

"(1) the character, credibility, reputation or criminal record of a party, suspect in a criminal investigation or witness, or the identity of a witness, or the expected testimony of a party or witness;

"....

"(3) the performance or results of any examination or test or the refusal or failure of a person to submit to an examination or test, or the identity or nature of physical evidence expected to be presented;

14

1130537 and 1130538

"....

"(5) information the lawyer knows or reasonably should know is likely to be inadmissible as evidence in a trial and would if disclosed create a substantial risk of prejudicing an impartial trial; or

"(6) the fact that a defendant has been charged with a crime, unless there is included therein a statement explaining that the charge is merely an accusation and that the defendant is presumed innocent until and unless proven guilty.

"(c) Notwithstanding paragraphs (a) and (b) (1-5), <u>a lawyer involved in the investigation or litigation of a matter may state without elaboration</u>:

"(1) the general nature of the claim or defense;

"(2) the information contained in a public record;

"(3) that an investigation of the matter is in progress, including the general scope of the investigation, the offense or claim or defense involved and, except when prohibited by law, the identity of the persons involved;

"(4) the scheduling or result of any step in litigation;

"(5) a request for assistance in obtaining evidence and information necessary thereto;

"(6) a warning of danger concerning the behavior of a person involved, when there is reason to believe that there exists the likelihood of substantial harm to an individual or to the public interest; and

1130537 and 1130538

"....

"(8) Notwithstanding paragraphs (a) and (b) above, a lawyer may make a statement that a reasonable lawyer would believe is required to protect a client from the substantial undue prejudicial effect of recent publicity not initiated by the lawyer or the lawyer's client. A statement made pursuant to this paragraph shall be limited to such information as is necessary to mitigate the recent adverse publicity."

Additionally, the Comment to Rule 3.6 recognizes:

"It is difficult to strike a balance between protecting the right to a fair trial and safeguarding the right of free expression. Preserving the right to a fair trial necessarily entails some curtailment of the information that may be disseminated about a party prior to trial, particularly where trial by jury is involved. If there were no such limits, the result would be the practical nullification of the protective effect of the rules of forensic decorum and the exclusionary rules of evidence. On the other hand, there are vital social interests served by the free dissemination of information about events having legal consequences and about legal proceedings themselves. The public has a right to know about threats to its safety and measures aimed at assuring its security. It also has a legitimate interest in the conduct of judicial proceedings, particularly in matters of general public concern. Furthermore, the subject matter of legal proceedings is often of direct significance in debate and deliberation over questions of public policy.

"No body of rules can simultaneously satisfy all interests of fair trial and all those of free expression. The formula in this Rule is based upon the ABA former Code of Professional Responsibility and the ABA Standards Relating to Fair Trial and

16

> Free Press, as amended in 1978. The standard to be applied in Rule 3.6(a) is the 'serious and imminent threat' test developed in the case of <u>Chicago Counsel of Lawyers v. Bauer</u>, 522 F.2d 242 (7th Cir. 1975)."

The United States Supreme Court has allowed limitations placed upon the speech of parties who are before a court in a pending case. In <u>Seattle Times Co. v. Rhinehart</u>, 467 U.S. 20 (1984), the United States Supreme Court addressed "the issue whether parties to civil litigation have a First Amendment right to disseminate, in advance of trial, information gained through the pretrial discovery process." 467 U.S. at 22. In that case, Keith Rhinehart, the spiritual leader of the Aquarian Foundation, a religious group, brought an action on behalf of himself and the Aquarian Foundation against the Seattle Times, the Walla Walla Union-Bulletin, the authors of certain articles that had appeared in those newspapers, and the spouses of the authors of the articles. Five female members of the Aquarian Foundation also joined the suit as plaintiffs. During the litigation, the defendants filed an order compelling discovery regarding the financial affairs of the Aquarian Foundation, the source of its donations, and other information. The plaintiffs argued that compelling

production of the identities of the Aquarian Foundation's members and donors would violate the First Amendment rights of the members and donors and would also violate their right to privacy, freedom of religion, and freedom of association. The plaintiffs moved for a protective order that would prevent the defendants from disseminating any information gained through discovery.

The trial court initially granted the motion to compel and refused to issue a protective order. However, the trial court later issued a protective order

> "covering all information obtained through the discovery process that pertained 'to the financial affairs of the various plaintiffs, the names and addresses of Aquarian Foundation members, contributors, or clients, and the names and addresses of those who have been contributors, clients, or donors of any of the various plaintiffs.' ... The order prohibited petitioners from publishing, disseminating, or using the information in any way except where necessary to prepare for and try the case. By its terms, the order did not apply to information gained by means other than the discovery process."

467 U.S. at 27. The defendants appealed from the protective order, and the plaintiffs appealed from the trial court's order granting the motion to compel production. The Washington Supreme Court affirmed both orders.

18

1130537 and 1130538

The United States Supreme Court granted certiorari in
that case.  In its opinion, the United States Supreme Court
stated:

    "It is, of course, clear that information
obtained through civil discovery authorized by
modern rules of civil procedure would rarely, if
ever, fall within the classes of unprotected speech
identified by decisions of this Court.  In this
case, as petitioners argue, there certainly is a
public interest in knowing more about respondents.
This interest may well include most -- and possibly
all -- of what has been discovered as a result of
the court's order under [Wash. Sup. Ct. Civil] Rule
26(b)(1).  It does not necessarily follow, however,
that a litigant has an unrestrained right to
disseminate information that has been obtained
through pretrial discovery.  For even though the
broad sweep of the First Amendment seems to prohibit
all restraints on free expression, this Court has
observed that '[f]reedom of speech ... does not
comprehend the right to speak on any subject at any
time.' American Communications Assn. v. Douds, 339
U.S. 382, 394-395 (1950).

    "The critical question that this case presents
is whether a litigant's freedom comprehends the
right to disseminate information that he has
obtained pursuant to a court order that both granted
him access to that information and placed restraints
on the way in which the information might be used.
In addressing that question it is necessary to
consider whether the 'practice in question
[furthers] an important or substantial governmental
interest unrelated to the suppression of expression'
and whether 'the limitation of First Amendment
freedoms [is] no greater than is necessary or
essential to the protection of the particular
governmental interest involved.' Procunier v.
Martinez, 416 U.S. 396, 413 (1974); see Brown v.

19

1130537 and 1130538

Glines, 444 U.S. 348, 354-355 (1980); Buckley v. Valeo, 424 U.S. 1, 25 (1976).

"A.

"At the outset, it is important to recognize the extent of the impairment of First Amendment rights that a protective order, such as the one at issue here, may cause. As in all civil litigation, petitioners gained the information they wish to disseminate only by virtue of the trial court's discovery processes. As the Rules authorizing discovery were adopted by the state legislature, the processes thereunder are a matter of legislative grace. A litigant has no First Amendment right of access to information made available only for purposes of trying his suit. Zemel v. Rusk, 381 U.S. 1, 16-17 (1965) ('The right to speak and publish does not carry with it the unrestrained right to gather information'). Thus, continued court control over the discovered information does not raise the same specter of government censorship that such control might suggest in other situations. See In re Halkin, 194 U.S. App. D.C., at 287, 598 F.2d, at 206-207 (Wilkey, J., dissenting).[18]

"Moreover, pretrial depositions and interrogatories are not public components of a civil trial. Such proceedings were not open to the public at common law, Gannett Co. v. DePasquale, 443 U.S. 368, 389 (1979), and, in general, they are conducted in private as a matter of modern practice. See id., at 396 (Burger, C.J., concurring); Marcus, Myth and Reality in Protective Order Litigation, 69 Cornell L. Rev. 1 (1983). Much of the information that surfaces during pretrial discovery may be unrelated, or only tangentially related, to the underlying cause of action. Therefore, restraints placed on discovered, but not yet admitted, information are not a restriction on a traditionally public source of information.

20

"Finally, it is significant to note that an order prohibiting dissemination of discovered information before trial is not the kind of classic prior restraint that requires exacting First Amendment scrutiny. See Gannett Co. v. DePasquale, supra, at 399 (Powell, J., concurring). As in this case, such a protective order prevents a party from disseminating only that information obtained through use of the discovery process. Thus, the party may disseminate the identical information covered by the protective order as long as the information is gained through means independent of the court's processes. In sum, judicial limitations on a party's ability to disseminate information discovered in advance of trial implicates the First Amendment rights of the restricted party to a far lesser extent than would restraints on dissemination of information in a different context. Therefore, our consideration of the provision for protective orders contained in the Washington Civil Rules takes into account the unique position that such orders occupy in relation to the First Amendment.

"_____

"[18]Although litigants do not 'surrender their First Amendment rights at the courthouse door,' In re Halkin, 194 U.S. App. D.C., at 268, 598 F.2d, at 186, those rights may be subordinated to other interests that arise in this setting. For instance, on several occasions this Court has approved restriction on the communications of trial participants where necessary to ensure a fair trial for a criminal defendant. See Nebraska Press Assn. v. Stuart, 427 U.S. 539, 563 (1976); id., at 601, and n. 27 (Brennan, J., concurring in judgment); Oklahoma Publishing Co. v. District Court, 430 U.S. 308, 310-311 (1977); Sheppard v. Maxwell, 384 U.S. 333, 361 (1966). 'In the conduct of a case, a court often finds it necessary to restrict the free expression of participants, including counsel,

21

1130537 and 1130538

> witnesses, and jurors.'  <u>Gulf Oil Co. v. Bernard</u>,
> 452 U.S. 89, 104, n. 21 (1981)."

467 U.S. at 31-34 (footnote omitted).

Ultimately, the Supreme Court held:

> "[W]here, as in this case, a protective order is
> entered on a showing of good cause as required by
> [Wash. Sup. Ct. Civil] Rule 26(c), is limited to the
> context of pretrial civil discovery, and does not
> restrict the dissemination of the information if
> gained form other sources, it does not offend the
> First Amendment."

467 U.S. at 37.

Subsequently, in <u>Gentile v. State Bar of Nevada</u>, 501 U.S. 1030 (1991), Dominic Gentile, an attorney, was reprimanded after a finding by the Disciplinary Board of the Nevada State Bar that he had violated an attorney disciplinary rule by making a statement to the press shortly after his client was indicted on criminal charges.  The Nevada Supreme Court affirmed the Board's decision, and Gentile appealed to the United States Supreme Court.  The Supreme Court was presented with the issue whether the application of the disciplinary rule violated the right to free speech guaranteed by the First Amendment.  In addressing that issue, the Supreme Court stated:

"It is unquestionable that in the courtroom itself, during a judicial proceeding, whatever right to 'free speech' an attorney has is extremely circumscribed. An attorney may not, by speech or other conduct, resist a ruling of the trial court beyond the point necessary to preserve a claim for appeal. <u>Sacher v. United States</u>, 343 U.S. 1, 8 (1952) (criminal trial); <u>Fisher v. Pace</u>, 336 U.S. 155 (1949) (civil trial). Even outside the courtroom, a majority of the Court in two separate opinions in the case of <u>In re Sawyer</u>, 360 U.S. 622 (1959), observed that lawyers in pending cases were subject to ethical restrictions on speech to which an ordinary citizen would not be. There, the Court had before it an order affirming the suspension of an attorney from practice because of her attack on the fairness and impartiality of a judge. The plurality opinion, which found the discipline improper, concluded that the comments had not in fact impugned the judge's integrity. Justice Stewart, who provided the fifth vote for reversal of the sanction, said in his separate opinion that he could not join any possible 'intimation that a lawyer can invoke the constitutional right of free speech to immunize himself from even-handed discipline for proven unethical conduct.' <u>Id</u>., at 646. He said that '[o]bedience to ethical precepts may require abstention from what in other circumstances might be constitutionally protected speech.' <u>Id</u>., at 646-647. The four dissenting Justices who would have sustained the discipline said:

"'Of course, a lawyer is a person and he too has a constitutional freedom of utterance and may exercise it to castigate courts and their administration of justice. But a lawyer actively participating in a trial, particularly an emotionally charged criminal prosecution, is not merely a person and not even merely a lawyer.

"'....

23

"'He is an intimate and trusted and essential part of the machinery of justice, an "officer of the court" in the most compelling sense.' _Id._, at 666, 668 (Frankfurter, J., dissenting, joined by Clark, Harlan, and Whittaker, JJ.).

"Likewise, in _Sheppard v. Maxwell_, [384 U.S. 333 (1966),] where the defendant's conviction was overturned because extensive prejudicial pretrial publicity had denied the defendant a fair trial, we held that a new trial was a remedy for such publicity, but

"'we must remember that reversals are but palliatives; the cure lies in those remedial measures that will prevent the prejudice at its inception. The courts must take such steps by rule and regulation that will protect their processes from prejudicial outside interferences. Neither prosecutors, counsel for defense, the accused, witnesses, court staff nor enforcement officers coming under the jurisdiction of the court should be permitted to frustrate its function. Collaboration between counsel and the press as to information affecting the fairness of a criminal trial is not only subject to regulation, but is highly censurable and worthy of disciplinary measures.' 384 U.S., at 363 (emphasis added).

"We expressly contemplated that the speech of those participating before the courts could be limited. This distinction between participants in the litigation and strangers to it is brought into sharp relief by our holding in _Seattle Times Co. v. Rhinehart_, 467 U.S. 20 (1984). There, we unanimously held that a newspaper, which was itself a defendant in a libel action, could be restrained from publishing material about the plaintiffs and their supporters to which it had gained access

24

through court-ordered discovery. In that case we said that '[a]lthough litigants do not "surrender their First Amendment rights at the courthouse door," those rights may be subordinated to other interests that arise in this setting,' id., at 32-33, n. 18 (citation omitted), and noted that 'on several occasions [we have] approved restriction on the communications of trial participants where necessary to ensure a fair trial for a criminal defendant.' Ibid.

"Even in an area far from the courtroom and the pendency of a case, our decisions dealing with a lawyer's right under the First Amendment to solicit business and advertise, contrary to promulgated rules of ethics, have not suggested that lawyers are protected by the First Amendment to the same extent as those engaged in other businesses. See, e.g., Bates v. State Bar of Arizona, 433 U.S. 350 (1977); Peel v. Attorney Registration and Disciplinary Comm'n of Ill., 496 U.S. 91 (1990); Ohralik v. Ohio State Bar Assn., 436 U.S. 447 (1978). In each of these cases, we engaged in a balancing process, weighing the State's interest in the regulation of a specialized profession against a lawyer's First Amendment interest in the kind of speech that was at issue. These cases recognize the long-established principle stated in In re Cohen, 7 N.Y.2d 488, 495, 199 N.Y.S.2d 658, 661, 166 N.E.2d 672, 675 (1960):

"'Appellant as a citizen could not be denied any of the common rights of citizens. But he stood before the inquiry and before the Appellate Division in another quite different capacity, also. As a lawyer he was "an officer of the court, and, like the court itself, an instrument ... of justice...."' (quoted in Cohen v. Hurley, 366 U.S. 117, 126 (1961)).

"We think that the quoted statements from our opinions in In re Sawyer, 360 U.S. 622 (1959), and Sheppard v. Maxwell, supra, rather plainly indicate

25

that the speech of lawyers representing clients in pending cases may be regulated under a less demanding standard than that established for regulation of the press in Nebraska Press Assn. v. Stuart, 427 U.S. 539 (1976), and the cases which preceded it. Lawyers representing clients in pending cases are key participants in the criminal justice system, and the State may demand some adherence to the precepts of that system in regulating their speech as well as their conduct. As noted by Justice Brennan in his concurring opinion in Nebraska Press, which was joined by Justices Stewart and Marshall, '[a]s officers of the court, court personnel and attorneys have a fiduciary responsibility not to engage in public debate that will redound to the detriment of the accused or that will obstruct the fair administration of justice.' Id., at 601, n. 27. Because lawyers have special access to information through discovery and client communications, their extrajudicial statements pose a threat to the fairness of a pending proceeding since lawyers' statements are likely to be received as especially authoritative. See, e.g., In re Hinds, 90 N.J. 604, 627, 449 A.2d 483, 496 (1982) (statements by attorneys of record relating to the case 'are likely to be considered knowledgeable, reliable and true' because of attorneys' unique access to information); In re Rachmiel, 90 N.J. 646, 656, 449 A.2d 505, 511 (N.J. 1982) (attorneys' role as advocates gives them 'extraordinary power to undermine or destroy the efficacy of the criminal justice system'). We agree with the majority of the States that the 'substantial likelihood of material prejudice' standard constitutes a constitutionally permissible balance between the First Amendment rights of attorneys in pending cases and the State's interest in fair trials.

"When a state regulation implicates First Amendment rights, the Court must balance those interests against the State's legitimate interest in

26

regulating the activity in question. See, e.g., <u>Seattle Times</u>, supra, 467 U.S. at 32."

501 U.S. at 1071-76 (footnote omitted).

In <u>Marceaux v. Lafayette City-Parish Consolidated Government</u>, 731 F.3d 488 (5th Cir. 2013), current and former officers ("the officers") of the Lafayette Police Department ("LPD") sued the LPD and other defendants under 42 U.S.C. § 1983. The officers communicated with the media about the case. They also maintained a Web site that contained an image of LPD's police chief, who was a party to the suit; "excerpts of critical statements made in the media" concerning the LPD and other defendants; and "certain voice recordings of conversations between the Officers and members of the Lafayette Police Department" and "other accounts of the Lafayette PD Defendants' alleged failings." 731 F.3d at 490-91. The LPD and other defendants requested a protective order in which they sought to limit the plaintiffs' communications with the media and to have the Web site taken down. Subsequently, the magistrate judge

> "'ordered that the parties' and their attorneys' contact and communication with and through the media shall be limited to (a) information contained in the public record; (b) identification of parties and claims/defenses asserted in this matter;

27

(c) the scheduling or result of any step in this litigation; (d) references that investigation(s) is in progress, without disclosure of investigation details; (e) requests for assistance in obtaining evidence or information; (f) warnings of danger concerning the behavior of persons who are parties in this case when there is reason to believe, based on a reasonable factual inquiry, that there exists a likelihood of substantial harm to an individual or the public interest.'

"The magistrate judge 'further ordered that the website ... shall be closed and removed immediately, ceasing all operations and publication, and that the recordings shall not be publicly disclosed outside the confines of this case and any other pending legal proceeding, absent leave of court.' The restrictions on communications with the media were expressly modeled on Louisiana Rule of Professional Conduct 3.6 and the language approved in [United States v.] Brown, 218 F.3d [415,] 429–31 [(5th Cir. 2000)], and Levine v. U.S. District Court, 764 F.2d 590, 598–99 (9th Cir. 1985). The magistrate judge also 'order[ed] the [W]ebsite be taken down' because it 'not only contain[ed] comments and information that would violate [Louisiana Rule of Professional Conduct] 4.4, it is and has been used as a vehicle by which to disseminate inappropriate information to the media and the public.' The primary rationale for the order was to allow for a fair trial by avoiding a taint on the prospective jury pool. Over objection, the district court adopted the magistrate judge's order, and this appeal followed."

731 F.3d at 491.

In addressing the order, the United States Court of Appeals for the Fifth Circuit stated:

28

"When restrictions are sought to be imposed on litigants after litigation is filed, a district court must balance a litigant's First Amendment rights against other important, competing considerations. See [United States v.] Brown, 218 F.3d [415,] 424 [(5th Cir. 2000)] ('"[A]lthough litigants do not surrender their First Amendment rights at the courthouse door, those rights may be subordinated to other interests that arise" in the context of both civil and criminal trials.' (quoting Seattle Times Co. v. Rhinehart, 467 U.S. 20, 32 n. 18 (1984))). Court orders restricting trial participants' speech are evaluated under the prior restraint doctrine, which requires that the record establish that the speech creates a potential for prejudice sufficient to justify the restriction. See Brown, 218 F.3d at 424-25. In addition, the restriction must be narrowly tailored and employ the least restrictive means of preventing the prejudice. Id. at 425. We note that the Officers represent that they are willing to accept the application to them of Louisiana Rules of Professional Responsibility 3.6 and 4.4 in this context, although those rules ordinarily would not apply to clients who are not lawyers. They object to the terms of the court's order only as they support or apply to the portion of the order mandating that the Website be removed in its entirety. Thus, we focus our analysis only on the portion of the order addressing removal of the entire Website."

731 F.3d at 492. The Fifth Circuit Court of Appeals noted that this area of law "demands a nuanced approach to the delicate balance between the necessity of avoiding a tainted jury pool and the rights of parties to freely air their views and opinions in the 'market square' now taking the form of the electronic square known as the Internet." 731 F.3d at 492.

29

It noted that, although the district court had applied a careful and nuanced approach in much of the protective order, with regard to the Web site, "the nuanced approach gave way to a more wholesale striking of its entire content -- indeed, the very website itself." Id.

In addressing the district court's wholesale striking of the Web site in Marceaux, the Fifth Circuit Court of Appeals stated:

"We analyze this issue under the prior restraint doctrine. Court orders aimed at preventing or forbidding speech 'are classic examples of prior restraints.' Alexander v. United States, 509 U.S. 544, 550 (1993). Indeed, this court has recognized that '[d]espite the fact that litigants' First Amendment freedoms may be limited in order to ensure a fair trial, gag orders ... still exhibit the characteristics of prior restraints.' [United States v.] Brown, 218 F.3d [415,] 424 [(5th Cir. 2000)]; see also Levine[ v. United States Dist. Court for the Central Dist. of California], 764 F.2d [590,] 595 [(9th Cir. 1985)](holding that a court's order prohibiting trial participants from speaking to the media constituted a prior restraint). The order here explicitly restricts the expression of attorneys and parties in this litigation as it relates to the media and prevents the Officers from expression in the Website. As a result, the protective order qualifies as a prior restraint.

"Prior restraints 'face a well-established presumption against their constitutionality.' Brown, 218 F.3d at 424-25 (citing Bernard v. Gulf Oil Co., 619 F.2d 459, 467 (5th Cir. 1980) (en banc) (citations omitted)); see also Org. for a Better Austin v. Keefe, 402 U.S. 415, 419 (1971) ('Any

30

> prior restraint on expression comes ... with a "heavy presumption" against its constitutional validity.'). We must therefore balance the First Amendment rights of trial participants with our '"affirmative constitutional duty to minimize the effects of prejudicial pretrial publicity."' Brown, 218 F.3d at 423 (quoting Gannett Co. v. DePasquale, 443 U.S. 368, 378 (1979)); see also Sheppard v. Maxwell, 384 U.S. 333, 363 (1966) ('The courts must take such steps by rule and regulation that will protect their processes from prejudicial outside interferences.')."

731 F.3d at 493 (footnote omitted). Ultimately, the Fifth Circuit Court of Appeals held that "the district court erred in concluding that the entirety of the Website was substantially likely to cause prejudice." Thus, it held that the district court's finding "'that the entire Website demonstrat[ed] a substantial likelihood of impacting the jury venire' is overbroad and clearly erroneous." 731 F.3d at 488. Although the Fifth Circuit vacated the district court's wholesale ban on the Web site, it noted:

> "[W]e do not intend to tie the hands of the district court in addressing some of its content, and we recognize that there may be bases upon which to order removal of some of the content of the Website. Recognizing the fact-bound nature of the inquiry and the limited nature of the record presented here, we express no opinion on that issue but note only that any such consideration of the Website's content must be narrowly tailored and represent the least restrictive means. [United States v.] Brown, 218 F.3d [415,] 425 [(5th Cir. 2000)] . In other words,

31

1130537 and 1130538

> the court must engage in a specific review of any claimed improper material."

731 F.3d at 495-96.

In this case, A-1 argues that the protective order and amended protective orders issued by the trial court were necessary to protect its right to a fair trial. However, those orders prohibit the plaintiffs and their attorneys from making <u>any</u> "extrajudicial references to the circumstances of [these] case[s]." Additionally, the trial court also ordered plaintiffs' counsel and his firm to "remove <u>all mention</u> of the above-styled case[s] and the surrounding circumstances of the above-styled case[s] from the firm's website and from the firm's and/or his individual Facebook page, Linkedin Page, and all social media (including electronic social media), and related web search engines." Finally, the trial court ordered the plaintiffs and their attorneys to refrain from even "referencing this case and/or its surrounding circumstances outside of court." Neither the protective order nor the amended protective orders in this case are narrowly tailored to protect A-1's right to a fair trial. Further, the orders do not provide any exceptions for making statements that are expressly allowed by Rule 3.6(c)(7), Ala. R. Prof. Conduct.

32

The amended protective orders do specify that they would not "prevent any attorney, law firm, and/or that law firm's staff from discussing this case with their respective clients, internally with persons working at any such law firm, with other attorneys involved in this case, including those attorney's staff, and/or with any expert witness."  However, the amended protective orders would still prevent the plaintiffs from discussing this case with potential clients; discussing this case with putative class members; discussing this case with state regulators; discussing the case with anyone in an attempt to discover evidence; and discussing the case with any potential non-expert witnesses.

For these reasons, the trial court's protective order and the amended protective orders are overbroad.  See Johanson v. Eighth Judicial Dist. Court of State of Nev. ex. rel. County of Clark, 124 Nev. 245, 252, 182 P.3d 94, 99 (2008) (holding that a gag order that "prevented 'the parties, their attorneys and any employees or persons associated with the parties or their counsel ... from disclosing any documents in this case or discussing the case with any ... other party or disclosing any information about this case to any other party or individual'" was unconstitutionally overbroad); Kemner v.

33

Monsanto Co., 112 Ill.2d 223, 246, 492 N.E.2d 1327, 1338 (1986) (holding that a gag order that provided that Monsanto "'shall not,' in any press release, etc., 'mention this case or intimate its existence or its trial or any particular facts or circumstances or positions concerning it until judgment is entered by this court'" was unconstitutionally overbroad).

In holding that the trial court's protective order and amended protective orders are overbroad, we do not intend to tie the trial court's hands in its attempt to prevent the jury venire from being tainted by the use of Web sites, social media, and pretrial publicity. As the Fifth Circuit Court of Appeals noted in Marceaux:

> "As in criminal matters, civil cases also require avoiding 'the potential that pretrial publicity may taint the jury venire, resulting in a jury that is biased toward one party or another,' [United States v.] Brown, 218 F.3d [415,] 423 [(5th Cir. 2000)], and preventing the 'creat[ion] [of] "a 'carnival atmosphere,' which threatens the integrity of the proceeding."' Id. at 423 n.8."

731 F.3d at 494. However, the trial court should balance its interest in protecting A-1's right to a fair trial against the First Amendment rights of the plaintiffs and their attorneys. Further, any protective order in this regard must be narrowly

34

tailored so that it uses the least restrictive means necessary to protect A-1's right to a fair trial. See Gentile, supra.

Finally, A-1 contends that plaintiffs' counsel included statements on its Web site and in social media that were false or misleading. If the trial court finds that the plaintiffs or their attorneys have made false or deceptive statements, it has the authority to proscribe such statements.

> "While the First Amendment guarantees the right to free speech, government is not prevented from proscribing certain speech. To be precise, demonstrable falsehoods are not protected by the First Amendment in the same manner as truthful statements. Brown v. Hartlage, 456 U.S. 45, 60, 102 S. Ct. 1523, 1532, 71 L. Ed. 2d 732 (1982); Gertz v. Robert Welch, Inc., 418 U.S. 323, 340, 94 S. Ct. 2997, 3007, 41 L. Ed. 2d 789 (1974)."

Dowling v. Alabama State Bar, 539 So. 2d 149, 151-52 (Ala. 1988).

## Conclusion

For the above-stated reasons, we conclude that the trial court's protective order and amended protective orders are overbroad. Accordingly, we grant the plaintiffs' petitions and direct the Etowah Circuit Court to rescind its January 7, 2014, protective order; its January 22, 2014, order compelling immediate compliance with the protective order; and its

1130537 and 1130538

February 21, 2014, and February 27, 2014, amended protective

orders.[2]

     1130537 -- PETITION GRANTED; WRIT ISSUED.

     1130538 -- PETITION GRANTED; WRIT ISSUED.

     Stuart, Parker, and Shaw, JJ., concur.

     Murdock, J., concurs in the result.

     Moore, C.J., recuses himself.

---

     [2]Based on our holding that the amended protective orders
are overbroad, we pretermit any remaining arguments raised by
the parties.